**Brian McAuthor McGEE, Petitioner,**

v.

**Richard KIRKLAND, Warden, Respondent.**

**Case No. CV 05–5077–PSG (OP).**

United States District Court, C.D. California.

June 18, 2010.

Brian McAuthor McGee, Imperial, CA, pro se.

Ryan Mitchell Smith, Timothy M. Weiner, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND FINAL RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

PHILIP S. GUTIERREZ, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, and the Report and Recommendation of the United States Magistrate Judge, *de novo.* The Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge,

IT IS ORDERED that Judgment be entered: (1) approving and adopting this Final Report and Recommendation; (2) directing that Judgment be entered granting the Petition and ordering Respondent to release Petitioner unless the State of California grants Petitioner a new trial within one hundred twenty (120) days.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

OSWALD PARADA, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Philip S. Gutierrez, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the writ of habeas corpus be granted.

### I.

### *PROCEEDINGS*

On July 12, 2005, Brian McGee ("Petitioner"), filed the current Petition for Writ of Habeas Corpus by a Person in State Custody under 28 U.S.C. § 2254 ("Petition"). On October 27, 2005, Respondent filed an Answer to the Petition. On February 13, 2006, Plaintiff filed a Reply to the Answer. Thus, this matter is ready for decision.

### II.

### *PROCEDURAL BACKGROUND*

On July 16, 2001, Petitioner was convicted after a jury trial in the Los Angeles County Superior Court of one count of first degree murder (Cal. Penal Code § 187(a)), and one count of attempted murder (Cal. Penal Code §§ 664/187).

(Clerk's Transcript ("CT") at 510–15.) On August 15, 2001, Petitioner was sentenced to a term of imprisonment of life without the possibility of parole. (*Id.* at 516–19.)

Petitioner appealed his conviction to the California Court of Appeal, "arguing the trial court erred in considering his several" motions pursuant to *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978) and *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and challenging evidentiary rulings. (Answer Ex. D.) On December 18, 2002, 104 Cal.App.4th 559, 128 Cal.Rptr.2d 309 (2002), the court of appeal reversed Petitioner's conviction because the trial court failed to inquire into the reasons for the prosecutor's first five peremptory challenges of prospective African–American jurors. (*Id.* at 207.) The court of appeal remanded the matter to allow the trial court to determine whether it could address the *Batson/Wheeler* issue and, if it could, to elicit and assess the prosecutor's reasons for excluding the prospective African–American jurors. (*Id.*)[1]

On remand, the trial court acknowledged that it "ha[d] not made an attempt to look for" its notes from voir dire and was "really not going to bother to because" it had recourse to the transcript, which was more complete and which refreshed its memory. (Second Reporter's Transcript ("2RT")[2] at 5–6, 12,17.)

The trial court found it could address the *Batson/Wheeler* issues, solicited the prosecutor's reasons for excluding the jurors, again denied Petitioner's *Batson/Wheeler* motions, and ordered the judgment reinstated. (*Id.* at 119–21.)

On November 15, 2004, 2004 WL 2580780, the California Court of Appeal affirmed Petitioner's conviction and sentence, rejecting Petitioner's contention that the trial court should have engaged in comparative juror analysis. (Answer Ex. J.)

Petitioner then filed a petition for review in the California Supreme Court. On January 19, 2005, the supreme court denied the petition. (Answer Ex. L.)

### III.

### *PETITIONER'S CLAIMS*

Petitioner presents the following claims for habeas corpus relief:

(1) The prosecution's exclusion of African–Americans from Petitioner's jury constituted *Batson/Wheeler* error;

(2) The trial court erroneously admitted certain out-of-court statements without a limiting instruction; and

(3) The trial court wrongfully excluded testimony bearing on an officer's credibility as a witness.

(Pet. at 5, 6.)

### IV.

### *STANDARD OF REVIEW*

The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

(d) An application for a writ of habeas corpus on behalf of a person in custody

---

**1.** Petitioner also filed a petition for review in the California Supreme Court. On March 26, 2003, the supreme court denied the petition. (Answer Ex. F.)

**2.** "1RT" and "2RT" refer respectively to the Reporter's Transcripts from Petitioner's trial

(Los Angeles Superior Court case number TA100412; Court of Appeal case number B15420), and from the evidentiary hearing ordered by the California Court of Appeal (Los Angeles Superior Court case number TA100412; Court of Appeal case number B170336).

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Further, a State court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n. 6 (9th Cir.2000); *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 1999). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court precedent creates clearly established federal law relating to the legal issue the

habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir.2004); *see also Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495. However, the State court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8, 123 S.Ct. 362.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d)). Consequently, a State

court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the State court's application of Supreme Court law was "objectively unreasonable." *Woodford,* 537 U.S. at 27, 123 S.Ct. 357. An "unreasonable application" is different from an erroneous or incorrect one. *Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Woodford,* 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. 685, 686, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

■ Where, as here, a higher state court has denied a claim without explanation, federal courts "look through" that denial to the last reasoned state decision, in this case, the November 2004 decision of the California Court of Appeal. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803–806, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard,* 234 F.3d 1072, n. 2 (9th Cir.2000).

## V.

### *DISCUSSION*

#### A. *Applicable Federal Law.*

##### 1. *Batson Three–Part Test.*

■ Under clearly-established federal law, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson,* 476 U.S. at 89, 106 S.Ct. 1712.[3] The Supreme Court has articulated a three-part test to govern the analysis of *Batson* claims:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California,* 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (citations, internal quotation marks, alterations, and footnote omitted) (quoting *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

■ The first step of the *Batson* test— the prima facie case—has three elements. Petitioner must show that (1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race. *Boyd v. Newland,* 467

---

**3.** The Ninth Circuit has held that in California, a *Wheeler* motion is the procedural equivalent of a federal *Batson* challenge. *Fernandez v. Roe,* 286 F.3d 1073, 1075 (9th Cir.2002) (quoting *Tolbert v. Gomez,* 190 F.3d 985, 987 (9th Cir.1999)); *see also Paulino v. Castro,* 371 F.3d 1083, 1089 n. 4 (9th Cir.2004) (defendant's objection under *Wheeler* at trial preserved his *Batson* claim).

F.3d 1139, 1143 (9th Cir.2006) (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712). "[A] defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170, 125 S.Ct. 2410.

The Supreme Court has explained what constitutes a "race-neutral explanation" when the burden shifts to the prosecution in the second step:

> The second step of this [*Batson*] process does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Purkett*, 514 U.S. at 767–68, 115 S.Ct. 1769 (alterations, citations, and internal quotation marks omitted) (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

■■■ "The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim." *Johnson*, 545 U.S. at 171, 125 S.Ct. 2410. "It is not until the *third* step that the persuasiveness of the [prosecution's] justification becomes relevant-the step in which the trial court determines whether the opponent of the [peremptory] strike has carried his burden of proving purposeful discrimination." *Id.* (quoting *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769). As the Supreme Court stated:

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.... [T]he issue comes down to whether the trial court finds the prosecutor's race-

neutral explanation to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

*Miller–El v. Cockrell*, 537 U.S. 322, 338–39, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller–El I*") (explaining *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769). Next,

> When conducting the analysis at the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination.

*Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir.2008) (citing *Batson*, 476 U.S. at 93, 106 S.Ct. 1712.).

■■ "Although the burden remains with the defendant to show purposeful discrimination, the third step of *Batson* primarily involves the trier of fact." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir.2006). The trial court "must evaluate the record and consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" *Id.* (quoting *Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859 (other citation and internal quotation marks omitted)). Consequently, when considering the totality of the relevant facts under *Batson's* third step, courts must review the record, including voir dire transcripts and venire members' questionnaires, to determine if a prosecutor's reasons for exercising a peremptory challenge are pretextual. *Id.* at 360, 371, 111 S.Ct. 1859. The record includes not only the prosecutor's statements about his jury selection strategy

and his explanations for the peremptory strikes, but also the characteristics of the venire members that were not challenged. *Id.* at 360, 111 S.Ct. 1859; *see also Miller–El v. Dretke,* 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller–El II* ") (finding that side-by-side comparisons of minority venire members who were struck and non-minority venire members allowed to serve are more powerful than bare statistics). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317.

■ Additionally, explanations which are objectively and demonstrably false, also may help the defense prove discrimination on the basis of race. *See United States v. Chinchilla,* 874 F.2d 695, 699 (9th Cir.1989); *see also Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994) ("*Chinchilla* was thus a case where two of the three explanations offered by the prosecutor were objectively and demonstrably false. Where, in such a case, defendant shows the remaining race-neutral reason is not sufficiently 'clear and reasonably specific,' he may be deemed to have carried his burden of proving intentional discrimination on the basis of race."). "The court need not accept any preferred rationale." *Kesser,* 465 F.3d at 359. When there is reason to believe that there is a racial motivation for a challenge, the Court is not "bound to accept at face value a list of

neutral reasons that are either unsupported by the record or refuted by it." *Id.* (quoting *Johnson v. Vasquez,* 3 F.3d 1327, 1331 (9th Cir.1993) (internal quotation marks omitted)).

### 2. *Comparative Juror Analysis.*

At the time of Petitioner's trial, comparative juror analysis was not required under California law.[4] *See People v. Jackson,* 13 Cal.4th 1164, 1197, 56 Cal.Rptr.2d 49, 920 P.2d 1254 (1996); *People v. Johnson,* 47 Cal.3d 1194, 255 Cal.Rptr. 569, 767 P.2d 1047 (1989). Here, consistent with state law at the time, neither the trial court nor the appellate court engaged in a comparative juror analysis.[5]

The Ninth Circuit has concluded that the Supreme Court's use of comparative analysis in *Miller–El II* was merely a clarification of *Batson's* step three framework. *See Boyd,* 467 F.3d at 1146 ("[I]f the Supreme Court's endorsement of comparative juror analysis on appeal constituted a new procedural rule, the Court would not have applied that rule to *Miller–El,* whose case came before the Court on an appeal from a denial of habeas corpus. Because the Court did engage in extensive comparative juror analysis, we can infer that *Miller–El II* must only have clarified the extant *Batson* three-step framework.") (internal citation omitted). Therefore, the use of comparative juror analysis to evaluate *Batson* claims is based on clearly established federal law, which was in existence by the time of Petitioner's last reasoned state court deci-

---

4. On July 24, 2008, the California Supreme Court reversed itself, holding that "[c]omparative juror analysis is evidence that ... must be considered [by the appellate court] when reviewing claims of error at *Wheeler/Batson's* third stage" even when such an analysis was not conducted below. *People v. Lenix,* 44 Cal.4th 602, 607, 80 Cal.Rptr.3d 98, 187 P.3d 946 (2008).

5. The Ninth Circuit previously considered the California courts' routine failure to conduct a comparative analysis because state law did not require it, commenting that "[t]he California courts may wish to revisit this position in light of *Miller–El [II].*" *Kesser,* 465 F.3d at 360 n. 3.

sion in 2004. *See Kesser,* 465 F.3d at 360 ("The Court's ... principles expounded in *Miller–El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the least reasoned state court decision in *Miller–El,* handed down in 1992, before *Kesser's* 1993 trial."); *see also Boyd,* 467 F.3d at 1150 ("[U]nder the clearly established Supreme Court precedent of *Batson,* comparative juror analysis is an important tool that courts should utilize on appeal when assessing a defendant's plausible *Batson* claim").

■ Here, the state courts' failure to conduct a comparative juror analysis satisfies the requirements for relief under the AEDPA and requires this Court to perform one *de novo. See Green,* 532 F.3d at 1031 (a federal habeas court "must conduct [the comparative juror] analysis *de novo,* rather than remanding for the state courts to do so."); *Kesser,* 465 F.3d at 361 ("[I]n *Miller–El [II],* the Court made clear that comparative analysis is required even when it was not requested or attempted in the state court"); *see also Frantz v. Hazey,* 533 F.3d 724, 735 (9th Cir.2008) (en banc) ("When 'the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires' ") (quoting *Panetti v. Quarterman,* 551 U.S. 930, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007)). Here the state court record is sufficient to allow for this Court's consideration of such an analysis in assessing the reasonableness of the state courts' adjudication of Petitioner's claim.

## B. *Petitioner's Claims of Batson/Wheeler Error.*

■ Petitioner contends his conviction must be reversed due to the prosecutor's improper exclusion of African–Americans from Petitioner's jury. (Reply at 1.) He claims that nine of the prosecution's eleven peremptory challenges, or 82% of them, were against African–Americans, and that the reasons given for these challenges were pretextual. (Reply at 3, 7–8.)

During voir dire, defense counsel made four motions pursuant to *Wheeler,* contending that the prosecutor had impermissibly exercised peremptory challenges to excuse African–American jurors on the basis of race. (1RT at 430, 432, 468, 484.) Defense counsel made the first motion after the prosecutor used five of his first six peremptory challenges to excuse African–American jurors. (*Id.* at 430.) The Court found there was no *prima facie* case, did not elicit the prosecutor's reasons for excusing those jurors, and denied the motion. (*Id.* at 430–31.)

Voir dire proceeded, and the prosecutor exercised his next peremptory challenge to excuse a sixth African–American juror. (*Id.* at 432.) Defense counsel renewed his *Batson/Wheeler* motion. (*Id.*) This time, the court found there was a *prima facie* case and elicited the prosecutor's reason for excluding the last juror, but refused to require the prosecutor to give reasons for the prior five peremptory challenges, the subjects of the first motion. (*Id.* at 433.) The court accepted the prosecutor's reason. (*Id.* at 436.)

Defense counsel renewed his *Batson/Wheeler* challenge twice more: once after the prosecution exercised two more peremptory challenges against African–American jurors and again after the prosecution struck an additional African–American juror during the selection of alternate jurors. (*Id.* at 468, 484, 148 Cal.Rptr. 890, 583 P.2d 748). The trial court found that the Petitioner had not made a prima facie showing as to either of the last two motions. (*Id.* at 469, 484.)

The court of appeal reversed Petitioner's conviction and remanded for an evidentiary hearing, holding that after finding that a *prima facie* case had been made after

Petitioner's second *Batson/Wheeler* challenge, the trial court should have elicited the prosecutor's reasons for striking the first five jurors. (Answer Ex. D at 202–03.) The court of appeal remanded the matter for the trial court to reconsider the second *Batson/Wheeler* challenge, and, if the court did not grant the second motion on remand, ordered it to also reconsider the third and fourth challenges. (*Id.* at 203.)

On remand, the trial court heard and accepted the prosecution's reasons for challenging all of the African–American jurors,[6] again without engaging in comparative juror analysis. (Answer Ex. J at 427–28; *see generally* 2RT.)

When Petitioner again appealed, the court of appeal affirmed the trial court's denial of his *Batson/Wheeler* motions as supported by substantial evidence. (*Id.* at 424, 444.) The appellate court rejected Petitioner's contention that the trial court should have engaged in comparative juror analysis, explaining that "the rule is clear in this state ... that in evaluating the sufficiency of the prosecutor's explanations, a reviewing court will not engage in such a comparative analysis regarding persons the prosecutor accepted." (*Id.* at 434.)

As he did in his second direct appeal, Petitioner here argues that he has provided "considerable evidence in this case of the prosecutor's discriminatory intent based on the prosecutor's use of reasons that applied equally to jurors he accepted, based on his mischaracterization of the prospective jurors' responses during voir dire, and based on his provision of reasons that were meaningless or unrelated to this case." (Reply at 10.) Petitioner cites, and incorporates by reference, the arguments he made in his second direct appeal regarding each juror, again contending that the court should have conducted a comparative juror analysis. (*Id.* at 4–5, 148 Cal. Rptr. 890, 583 P.2d 748; Answer Ex. G.) Respondent does not address comparative juror analysis or suggest its proper outcome. Instead, Respondent contends the prosecutor offered race-neutral reasons for excusing all of the African–American jurors. (Answer at 7–10.)

■■■ In any event, a *de novo* review of the voir dire transcript, the record before the state courts, the transcript on remand, and a comparative analysis with jurors remaining on the jury[7] not only shows that at least two of the panel members, Juror Nos. 4046 and 9744, were struck on account of race, but it also contains other evidence of discriminatory intent.

---

**6.** Notwithstanding the vast body of *Batson/Wheeler* case law, in again denying Petitioner's *Batson/Wheeler* motions, the trial court stated, "And I can't imagine anybody— any lawyer excluding jurors simply because of the race. There's got to be some other reason. I mean, I'm just thinking unless it's a totally unfounded bias, you know, the prosecutor certainly wants to win his case, and race just wouldn't appear to me to be a reason to exclude a juror." (2RT at 64.) Thus, it appears the trial court judge may have been predisposed to *not* find any *Batson/Wheeler* error.

**7.** It is important to note that two jurors do not have to have all the same characteristics to be similarly situated. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Green*, 532 F.3d at 1030 n. 3 (quoting *Miller– El II*, 545 U.S. at 247 n. 6, 125 S.Ct. 2317). Moreover, even the existence of one pretextual reason to strike a juror militates against the sufficiency of race-neutral ones with respect to that juror. *Kesser*, 465 F.3d at 360 ("A court need not find all nonracial reasons pretextual in order to find racial discrimination"); *see also Chinchilla*, 874 F.2d at 699 ("the fact that two of the four preferred reasons do not hold up under judicial scrutiny militates against their sufficiency.").

## C. *Evidence of Discriminatory Intent.*

### 1. *Juror No. 4046.*

In this case, the prosecution's first strike against an African–American was against Juror No. 4046, a widow with four children, who stated that her "occupation right now is a substitute cafeteria helper." (1RT at 327–28.) She reported that her home had been burglarized four or five times, incidents she reported to the police; she had not been the victim of any other crimes; and she had never witnessed a crime. (*Id.*) She never got her stolen property back, and no one was ever arrested for the burglaries. (*Id.*) She had no prior jury service. (*Id.*) Only one of her four daughters was currently working and had been working for twenty-five years for the County of Los Angeles as a payroll clerk. (*Id.*) She had no "yes" answers to any of the questions on the questionnaire. (*Id.*) This was the sum total of the information this prospective juror relayed during voir dire.

The prosecutor explained on remand that he struck this juror because of the lack of any jury experience despite her "advanced" age and "ample opportunity to serve on jury duty." (2RT at 26–27.) He also believed she did not show a strong personality, was passive in some of her statements, did not "rise up and stand up against the fact that her home had been burglarized several times," and "did not give precise occupations" about the three of her four children who were unemployed. (*Id.*) The prosecutor claimed he did not question this juror about her unemployed children because he did not wish to embarrass her. (2RT at 27.) In the brief prepared by the prosecutor in response to the court-ordered rehearing of the *Batson/Wheeler* motions, the prosecutor suggested, among other similarly conclusory statements which will be discussed later, that these facts showed that "Ms. Jackson was not focused on reducing [crime] in her neighborhood or her life and had allowed criminal victimization to become an everyday part of her life"; and "[t]he possibility that three of her daughters were unemployed reflected negatively upon this potential juror." (CT at 50.)

The prosecutor's stated reasons for striking Juror No. 4046 are unsupported by the record and/or fail after conducting a comparative analysis. For instance, there is no evidence that despite her advanced age this juror had never been called for jury duty before—she merely stated that she had "never done jury duty before." (1RT at 327.) At least one other person of advanced age, a retired truck driver who had never served on a jury before, remained on the jury. (*Id.* at 414–15.) Several other jurors had been called to service but never served (*see, e.g.,* 1RT at 450, 451, 454), and some simply reported they had no prior jury service (*id.* at 325, 326, 344). Indeed, given the ambiguity inherent in the question "Have you ever served on jury duty before" (*id.* at 313), it is quite possible that Juror No. 4046 only reported the fact that she had never served as a member of a jury and did it not feel it necessary to mention whether she had ever been called to serve.

Moreover, this juror did indeed "stand up" when her house was burglarized—by reporting each of the crimes to the police. (*Id.* at 327.) Moreover, despite this purported reason for striking this juror, at least one juror who remained on the panel had been the victim of three burglaries and reported only one of them to the police. (*Id.* at 412–13.) The prosecutor also noted that "Often times, jurors recount with great detail the horror of having their home burglarized and volunteer numerous details about when it happened, how it happened, and indicate the affect [sic] such a crime had on them mentally." (CT at 49.) He claimed, therefore, that it was

unusual that this juror did not elaborate about the burglaries of her home, concluding from this that "she was timid, was not detail oriented, and [was] potentially unable to contribute to the jury deliberations." (*Id.*; 2RT at 27.)

These claims and conclusions are illogical and unsupported by the record. In fact, a comparison with other jurors also shows that of the fifteen prospective jurors who reported having been victims of burglaries, two-thirds did not elaborate about the burglaries at all. (*Id.* at 313–14, 332, 339, 371, 402, 411–12, 442–43, 448, 474, 480.) Of the remaining five, three elaborated only minimally and one elaborated only after questioning. (*Id.* at 322, 331, 343, 415.) Reporting each of her four or five burglaries to the police does not appear to be the characteristic of a "timid" or "passive" person allowing "criminal victimization to become an everyday part of her life."

With respect to Juror No. 4046's alleged reticence about the occupations of her children, when asked "What are your children's occupations?" she answered that only one was working and had been working for Los Angeles County for about twenty-five years as a payroll clerk. (1RT at 328.) Consequently, this juror answered the question she was asked. If this were an important issue to the prosecutor, he certainly could have asked her follow-up questions regarding her non-working children. It is difficult to see why such questions would embarrass this juror in particular. The prosecutor certainly asked some of the other jurors far more potentially embarrassing questions about themselves or their families. (*See, e.g.,* 1RT at 425 (pointing out the juror was carrying a Bible and asking for an explanation); 463 (stating "I don't mean to embarrass you," and asking the juror questions about his being arrested as a result of outstanding traffic tickets); 466–67 (asking a juror whether she likes her job and finds it rewarding).) The prosecutor's stated contention that "when discussing spouses, a juror will [frequently] say that their spouse is a homemaker rather than say that the person does not work" (CT at 50), bears no relevance to discussions involving the occupations of non-working children. Nor did the prosecutor offer an explanation as to why having children who were not working in any way affected this juror's ability to sit as a juror on this case. *Green*, 532 F.3d at 1030 (reasons given must be relevant to the case). He did not seem to have unemployment-related concerns about Juror 3997 who "chooses to be unemployed," nor about the adult, college-educated son of a prospective juror who was also unemployed by choice. (1RT at 343, 454.)

Moreover, although the prosecutor claimed to have excused Juror No. 4046 because her responses were passive, one juror remained on the panel in seat 19 who heard at least eighteen other prospective jurors respond at length to the numerous standard questions and the sixteen question special questionnaire and merely stated, "I am a resident of Carson. And married. That's it." [8] (*Id.* at 412.) He did not volunteer more information until the court told him, "No, that's not it. There are some more questions." (*Id.*) He then reported, after persistent questioning, that he was the victim of three burglaries (only two of which he reported); that he has six children, one of them handicapped; his wife's occupation; the occupations of his five non-handicapped children and where they lived; his own occupation (retired

---

8. In fact, as a result of this juror's passivity, his voir dire went on for three pages in the transcript. The voir dire of Juror No. 4046 filled little over a page yet garnered much the same information in the end.

truck driver); that he had never served on a jury; and that he had never witnessed a crime. (*Id.* at 412–15.)

Another of the prosecutor's reasons for striking Juror No. 4046, set forth in the prosecution's response to Petitioner's points and authorities on remand, was her lack of jury experience coupled with her apparent lack of educational background and unskilled occupation:

> She stated that she was currently a substitute cafeteria helper. The prosecutor is always wary of an individual who seemingly would have had numerous opportunities to serve on a jury yet had not done so in a long lifetime. Therefore the prosecutor coupled that lack of jury experience with an examination of the juror's apparent educational background and occupation. It does not appear that a cafeteria helper would require an advanced education and yet Ms. Jackson was only substituting in that position.[9] ... A special circumstance murder that involved a complex fact pattern, a defense that possibly involved impeaching witnesses, and numerous jury instructions did not appear appropriate for a juror with this background.

(CT at 49.) On remand, the trial court noted "[A]nd her being a cafeteria helper, I think the People can infer from that possibly she didn't have a lot of education and would not be able to evaluate all the issues the way that they would like to see her evaluate them." (1RT at 45.) The Court finds that this is an unsubstantiated inference given the lack of information the prosecutor and the court had about this juror. Moreover, many of the jurors who remained on the panel had non-technical occupations from which it might be similarly (and potentially wrongly) assumed

they did not have extensive educational training, including a clerk at a computer store; a bail bonds agent; a maintenance engineer; a truck driver; and a stock clerk in a repair center. (*Id.* at 321, 325, 414, 450.)

■ Pretext is apparent when a given explanation applies equally to jurors against whom the prosecutor did not use peremptory challenges, *Miller–El I*, 537 U.S. at 342–43, 123 S.Ct. 1029, or when the reasons are unsupported by the record, *Kesser*, 465 F.3d at 359. Based on the foregoing, the Court finds that the prosecutor's stated reasons for striking Juror No. 4046 appear to have been pretextual.

### 2. *Juror No. 9744.*

Juror No. 9744 was an African–American unmarried woman, working as a customer service representative. She had previously been on a jury that reached a verdict. (Answer Ex. J at 441.) During voir dire, all prospective jurors were asked "Have you or any close friend or relative ever been arrested for a crime or charged with any criminal offense." (1RT at 320.) In response, Juror No. 9744 stated "I have nephews and cousins that's in prison." (*Id.* at 472.) In response to a follow-up question regarding the offenses for which they were incarcerated, she responded: "one is for bank robber[y], the other for embezzlement. I don't know what the other one did." (*Id.* at 473.)

Her statements during voir dire suggest that Juror No. 9744 had three incarcerated relatives and may not have been all that close to at least one of them, since she did not even know for what he or she was imprisoned. The prosecutor asked Juror No. 9744 no further follow-up questions

---

**9.** It appears that the prosecutor is attempting to suggest that the fact that Juror No. 4046 was only a part-time cafeteria helper somehow implies that she was lacking in education and did not even have the minimal educational background required to do the job on a full-time basis. Such a contention is nonsensical.

before excusing her. (*See id.* at 472–73, 483.)

Juror No. 9744 was the last African-American struck by the prosecution and the subject of Petitioner's fourth *Batson/Wheeler* motion. When defense counsel challenged the prosecutor's peremptory of this juror, the prosecutor gave only one reason for excusing Juror No. 9744: "The one thing that struck me she said she had several people, several relatives, close relatives, and nephew, and I believe cousins that were in prison. That great number caused me some concern." (*Id.* at 484.) The court's only response to the prosecutor's reason for excusing Juror No. 9744 was "okay." (*Id.*)

At the later renewed hearing, the prosecutor reiterated that he had excused Juror No. 9744 because she had "several relatives that were in prison for bank robbery, for embezzlement, for an unknown crime." (2RT at 59–60.) He confirmed that "that this large number of people in prison was the reason why [he] excused [Juror No. 9744]." (*Id.*) When questioned by defense counsel, the trial court explained that when it said "okay" during voir dire in response to the prosecutor's explanation, it was "essentially saying all right, let's move on because I already found no prima facie case." (*Id.* at 60.) On remand, the trial court also accepted the prosecutor's reasoning, finding there was no prima facie case of discrimination, and the appellate court affirmed.[10] (Answer Ex. J.) Neither court did a comparative analysis despite Petitioner's urging.

Preliminarily, as Juror No. 9744's statements are somewhat ambiguous as to how many relatives she had in prison and how close she was to these relatives. The prosecutor could have inquired about these issues had his concern with the "great number" of incarcerated persons she knew been genuine. *See Green*, 532 F.3d at 1033 (citing *Miller–El II*, 545 U.S. at 246, 125 S.Ct. 2317). The prosecutor instead asked Juror No. 9744 no questions before excusing her.[11] (1RT at 472–73, 483–84.) The prosecutor's failure to "engage in any meaningful voir dire examination" about "a subject the State alleg[ed] it [was] concerned about" is "evidence suggesting that the explanation is a sham and a pretext for discrimination." *Green*, 532 F.3d at 1033 (citing *Miller–El II*, 545 U.S. at 246, 125 S.Ct. 2317).

A review of the record shows that the prosecutor's reason for striking Juror 9744 also is severely undercut by the prosecutor's failure to object to other panel members who gave similar responses to the self and family criminal history question. *See Miller–El II*, 545 U.S. at 248, 125 S.Ct. 2317 ("On the face of it, the explanation is reasonable from the State's point of view, but its plausibility is severely undercut by the prosecution's failure to object to other panel members who expressed views much like [the stricken juror]."). The implausibility of the prosecutor's explanation is further reinforced by the prosecutor's acceptance of Juror No. 9694, a non-African-American juror who disclosed she had two cousins and a close friend in prison, all for

---

10. The California Court of Appeal found that on remand the trial court "erred by conducting its inquiry in the reverse order—by hearing the reasons for the peremptory challenges first before ruling there was no prima facie case" but found the error harmless. (Answer Ex. J at J442.)

11. The prosecutor did ask most of the other jurors who either themselves had a criminal history, or who had family members with criminal histories, whether they felt the person had been treated fairly or unfairly, and/or whether they were close to the family member (*see, e.g.,* 1RT at 346, 358–59, 399, 405, 406–07, 409, 418–20, 440–41, 454, 455–56, 459, 464.)

murder, the very crime for which Petitioner was tried and convicted, and, arguably, appear to have been more serious crimes than those for which Juror No. 9744's relations were incarcerated. *See Snyder v. Louisiana,* 552 U.S. 472, 128 S.Ct. 1203, 1211, 170 L.Ed.2d 175 (2008) (implausibility of explanation reinforced by the prosecutor's acceptance of white jurors who disclosed scheduling conflicts that appear to have been at least as serious as the scheduling conflicts of the excluded African–American juror). (*See also* RT at 418, 472–73.)

Further evidence that the prosecution's stated concern with Juror No. 9744 was pretextual are the two additional non-African-American jurors whom the prosecution accepted and who had criminal histories themselves, and/or persons with criminal histories in their immediate families. For example, Juror No. 3997, had a nine-year-old arrest for driving under the influence and a brother in prison, who was a "habitual offender." (1RT at 455–56.) Similarly, Juror No. 6624's son had been arrested for possessing drug paraphernalia and her brother also had a driving under the influence conviction. (*Id.* at 441.) In one of his two strikes of a non-African-American,[12] the prosecutor also excused an Hispanic or Asian juror whose cousin and brother had previously been jailed. (Clerk's Transcript ("CT") at 51.) The stated reason for excusing this juror was the "significant number of people in her family committing crimes." (*Id.*) In the other strike of a non-African-American, a Latina, the prosecutor stated only that she was excused because her sister had recently been placed in custody and had lost her children to foster care. (*Id.* at 54.) Given the fact that the prosecutor's "significant" number was apparently as low as one or

two family members with a criminal history, the fact that he did not excuse non-African-American Juror Nos. 6624 or 3997 makes this stated reason for excusing the African–American jurors even more suspect.

Given this context, the prosecutor's purported concern with the criminal histories of Juror No. 9744's family members is implausible. Because the reason given for striking this African–American juror applies just as well to similar non-African-Americans permitted to serve on the jury, the Court finds that the explanation served only as a pretext for purposeful discrimination. *See Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 ("[I]mplausible or fantastic explanations may (and probably will) be found to be pretexts for purposeful discrimination."); *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317.

### 3. *Additional Evidence of Pretext.*

Given the above with respect to Juror Nos. 4046 and 9744, the state courts' findings that the prosecutor's reasons were race-neutral was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Kesser,* 465 F.3d at 358 ("We hold that the California courts, by failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine. We conclude that the California courts' findings are not merely wrong, but an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.") (citation and internal quotations marks omitted). Although there is sufficient to establish *Batson* er-

---

**12.** The Court notes that the prosecutor's two strikes that were not against African–American cans also were against minorities.

ror, there was additional evidence of pretextual explanations for striking other jurors, making it "even harder to believe that [the] reasons for striking [Juror Nos. 4046 and 9974] were race-neutral." *Kesser*, 465 F.3d at 369 (collecting evidence of pretextual reasons to strike two Native American jurors without deciding "whether there was any genuine nonracial reasons for striking each of these jurors," in order to undercut the prosecutor's credibility).

■ In considering a *Batson* challenge, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted. *Snyder*, 128 S.Ct. at 1208; *see also Miller–El II*, 545 U.S. at 239, 125 S.Ct. 2317 ("[W]e ... held [in *Batson*] that a defendant could make a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial.") (citation omitted). Although the evidence for a race-based strike of Juror Nos. 4046 and 9744 is clear and most obvious with respect to these jurors, the prosecutor's credibility is drawn further into question by a number of additional implausible or unsupported explanations set forth during voir dire that bear upon the prosecutor's intent.

First, the prosecutor's credibility is undermined with respect to his failure to strike the non-African-American Juror No. 9694. After Petitioner's second *Wheeler* motion, the prosecutor gave the following reason for striking another African–American juror, No. 3744:

> I have been a prosecutor in L.A. County for almost six years now and during that time I've had trials that have resulted in

hung juries or mistrials frequently. Those people have been employed by the United States Postal Service or have been employed by L.A. Unified School District. Basically, I've had problems with teachers and mail carriers. That is as unscientific as that may seem, it is the nature of the occupation. Sometimes renders it difficult for them to render a decision in cases such as this.

(*Id.* at 434.) Yet, despite this alleged problem with Los Angeles Unified School District teachers as well as postal workers [13] and his apparent concern about hung juries, the prosecutor kept Juror No. 9694, a non-African-American substitute teacher with the Los Angeles Unified School District. (*See id.* at 415.) Indeed, the record shows that at least three teachers, with at least one from the Los Angeles Unified School District, remained on the panel until stricken by the defense. (Answer Ex. A at 14; Ex. G at 279.)

Despite his concern about hung juries, the prosecutor failed to ask any questions of two prospective jurors who had actually served as part of a hung jury. (1RT at 337–38, 387–91, 456, 463–68.) He also left at least one non-African-American on the jury, Juror No. 9694, who specifically stated several times that she thought she could not be fair. Juror No. 9694 expressed uncertainty as to whether she could base her decision only on the information presented at trial because her twin brother had been assaulted and badly injured on the street two days before voir dire. (1RT at 418.) In response to defense counsel's inquiry whether it would be difficult for her to focus on the trial, Juror No. 9694 thought it "might be because"

---

13. Thus, African–American Juror 3744, a mail processor for UCLA was excused because "[t]he tedious nature of working with millions of pieces of mail causes the prosecutor to believe that a juror with this occupation would not be used to listening and focusing on the numerous details associated with sitting on a jury. Furthermore, analysis of those details may be difficult for a person employed in this capacity." (CT at 50.)

her brother's assault was "very fresh in [her] mind." (*Id.* at 419.) She said twice she could not "say for sure" she could put aside what had happened in her brother's life and decide Petitioner's case based on the evidence presented in court. (*Id.* at 419.) In contrast, Juror No. 9744 had previously been on a jury that reached a verdict and expressed no uncertainty as to whether she could be fair. Yet, despite Juror No. 9694's clear hesitation and ambivalence about her ability to be fair, the prosecutor did not exclude this juror. Thus, the prosecutor's explanation that he strikes teachers and postal workers and was concerned about hung juries also appears to have been a pretext for striking African–American jurors.

Nor does the Court find that the prosecutor's credibility is in any way buoyed by his statement on remand that he had thought about excusing non-African-American Juror No. 9694, but decided not to because he "wasn't sure what else [he] was going to get." (2RT at 42.) He went on to state on the record that "[R]eticence about excusing everybody kind of holds true when you also consider some of the jurors that came up later that we'll discuss later." (*Id.*) The Court notes that what "came up later," after the voir dire of Juror No. 9694, was the prosecutor's exercise of seven additional challenges, all of them against African–Americans, many with similar characteristics to Juror No. 9694 or to other jurors remaining on the panel.

The prosecutor stated yet another apparently pretextual reason for excusing an African–American when he excused African–American Juror No. 6072. The pros-

ecutor's stated reason for excusing this juror was that she herself had been previously convicted for petty theft and receiving stolen goods, crimes of "moral turpitude." (1RT at 407–09; 2RT at 29.)[14] He also struck two others, Juror Nos. 5912 and 4303, at least in part because of minor offenses in their background: petty theft and unpaid traffic tickets. (2RT at 28, 54; CT at 52.) However, the prosecutor did not excuse non-African-American Juror, No. 3997, who had a prior drunk driving arrest. (1RT at 439, 455–56, 463–67.) The same is true of another potential juror, Mr. Killeen, who had also been convicted of drunk driving but was neither questioned nor struck by the prosecutor.[15] (1RT at 402, 404.)

The contradictions and pretext do not end with Juror Nos. 9744, 4046, 3744, 6072, 5912, and 4303. With respect to Juror No. 3378, the prosecutor claimed to strike her because he was "very troubled by . . . her ability to separate her own personal experiences and the experiences of her relatives and close friends [ ]—that were victims or defendants from the facts in this case." (2RT at 29.) This juror, the victim of a gang rape, had been threatened at gunpoint and told not to report the crime which, legitimately, the prosecutor tied into the fact that the charges against Petitioner included the killing of a witness. The prosecutor also professed, however, to be concerned about her "strong opinions" about how her cousin and those charged with her cousin's death should have been treated. (CT at 52; 2RT at 46–47.) He also expressed concerns about another juror, No. 4191, and his "strong opinions." (2RT at 54) (He appeared to the People to

---

**14.** The prosecutor also unsuccessfully attempted to reinforce this reason by stating, "[I]t just so happened that the people that had relatives in prison or that had suffered convictions happened to be African–American." (2RT at 52.) As discussed, several non-Afri-

can-American jurors with these same characteristics were left on the jury.

**15.** This juror was struck by the defense. (1RT at 429.)

have ... some very strong opinions coming into this process, and I did not believe that he would make a fair juror in this case.") In stark contrast, however, the prosecutor praised non-African-American Juror No. 9694's strong opinions about the criminal justice system and kept her on the jury.[16]

Moreover, statistical data provides some evidence of racial discrimination in the prosecutor's use of his peremptory challenges. *See Miller–El II*, 545 U.S. at 240, 125 S.Ct. 2317 (evidence of discriminatory intent includes statistical data "describing the prosecution's use of peremptories"); *Batson*, 476 U.S. at 95, 106 S.Ct. 1712 ("When circumstances suggest the need, the trial court must undertake a factual inquiry that takes into account all possible explanatory factors in the particular case.") (internal quotation marks and citation omitted). Here, "[t]he numbers describing the prosecution's use of peremptories are remarkable." *Miller–El II*, 545 U.S. at 240, 125 S.Ct. 2317. The prosecutor used nine of his eleven peremptories, or 82%, against black venire members. *Batson*, 476 U.S. at 94, 106 S.Ct. 1712 ("Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the result bespeaks discrimination.") (internal quotation marks and citation omitted); *see also Green*, 532 F.3d at 1033 ("Additional evidence of racial discrimination includes the fact that the prosecutor used peremptory challenges to remove all six African–Americans from the seated jury pool.").

As in *Miller–El I*, "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective ju-

rors." *Miller–El I*, 537 U.S. at 342, 123 S.Ct. 1029 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members, and only one served on petitioner's jury. In total, 10 of the prosecutors' 14 peremptory strikes were used against African–Americans. Happenstance is unlikely to produce this disparity."). In this case, weighing in favor of the prosecution, but not dispositive, is the fact that five African–Americans remained on the jury. *See United States v. Williamson*, 53 F.3d 1500, 1510 (10th Cir.1995) (presence of African–Americans on the jury when the prosecutor could have struck them weighs against *Batson* error). However, given the evidence in the record providing proof of the prosecutor's discriminatory intent, that fact is not enough.

## D. *Conclusion.*

The trial court's failure to engage in comparative juror analysis constitutes a decision contrary to clearly established federal law. *See Green*, 532 F.3d at 1031; *Frantz*, 533 F.3d at 735. Nor did the appellate court's analysis remedy the trial court's error. Instead, the court of appeal merely reiterated the prosecutor's stated reasons and then found they were race-neutral without analyzing the other evidence in the record to determine whether those reasons were in fact the prosecutor's genuine reasons. *Green*, 532 F.3d at 1031. In fact, the court of appeal specifically refused to conduct a comparative analysis. In doing this, the appellate court erroneously combined *Batson's* second and third steps into one. *See Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (finding that the lower

---

**16.** Juror No. 9694 stated that one of her cousins died in prison and "deserved it." (1RT at 418.) She stated that the other cousin and close friend in prison did not deserve what they got and had been treated "very very, extremely" unfairly. (*Id.*) She also stated that after a burglary of her home, she found the system was also unfair since she was made to feel like the criminal during her testimony. (*Id.* at 416.)

court erred by "combining *Batson's* second and third steps into one").

"Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, but racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *Miller–El II,* 545 U.S. at 237–38, 125 S.Ct. 2317 (internal quotation marks and citations omitted). Here, the prosecutor's proffer of pretextual explanations for striking Juror Nos. 4046 and 9744 "gives rise to an inference of discriminatory intent." *Snyder,* 128 S.Ct. at 1212; *see Miller–El II,* 545 U.S. at 252, 125 S.Ct. 2317 (noting the pretextual significance of a stated reason that does not hold up). Neither the trial court nor the court of appeal made any serious effort to conduct the thorough inquiry required by *Batson.* Had the state courts conducted the careful analysis required by *Batson's* third step, they would have discovered that the prosecutor's proffered justifications for striking Juror Nos. 4046 and 9744 were unsupported and contradicted by the record. This defective fact-finding process led to factual determinations that were "wrong, and unreasonably so." *See Kesser,* 465 F.3d at 368.

Based on the foregoing, the Court finds that the state court's decision that the prosecutor's use of peremptory challenges with respect to Juror Nos. 4046 and 9744 was legitimate was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2); *Green,* 532 F.3d at 1033. Indeed, the Court is persuaded that the "state court's conclusion that the prosecutor['s] strike[ ] of [Juror Nos. 4046 and 9744 was] not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous." *Miller–El II,* 545 U.S. at 266, 125 S.Ct. 2317; *see Kesser,* 465 F.3d at 368 ("Indeed, we think the record so strong on this point that it cannot admit any other conclusion, and even satisfies the more demanding standard of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks and citations omitted); *see* 28 U.S.C. § 2254(e)(1). Thus, habeas relief is warranted on this claim.[17]

## VI.

### *RECOMMENDATION*

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) directing that Judgment be entered granting the Petition and ordering Respondent to release Petitioner unless the State of California grants Petitioner a new trial within one hundred twenty (120) days.

---

**17.** Given the Court's recommendation, it declines to reach the merits of Petitioner's other two claims.