Filed 11/3/14 In re McGee CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re BRIAN McGEE,<br><br>on Habeas Corpus. | B253231<br><br>(Los Angeles County<br>Super. Ct. No. TA100412)<br><br>ORDER MODIFYING OPINION<br>(NO CHANGE IN JUDGMENT) |

THE COURT:

IT IS ORDERED that the opinion filed herein on October 15, 2014, be modified as follows:

1. On page 18, the text of footnote 5 shall be deleted and replaced with the following text:

McGee's habeas petition includes several arguments regarding his *Wheeler* motions that are unrelated to the issue of comparative juror analysis. He asserts (among other things) that several of the prosecutor's reasons for exercising his peremptory challenges were "unsupported by the record" and irrelevant to the prospective juror's ability to serve on the panel. Each of these arguments was either considered in the direct appeal or could have been raised in the direct appeal. We therefore decline to address the claims. (See *Reno, supra,* 55 Cal.4th at p. 476 [legal claims previously rejected on direct appeal cannot be "reraised" in a habeas petition]; In *re Dixon* (1953) 41 Cal.2d 756, 759

["the writ [of habeas corpus] will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"].)

The foregoing does not affect a change in the judgment. Petitioner's petition for rehearing is denied.

_____

PERLUSS, P. J.                    WOODS, J.,                    ZELON, J.

Filed 10/15/14  In re McGee CA2/7 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| In re BRIAN McAUTHOR McGEE,<br><br>on Habeas Corpus. | B253231<br><br>(Los Angeles County<br>Super. Ct. No. TA100412) |

ORIGINAL PROCEEDING for petition for writ of habeas corpus, Arthur Lew, Judge.  Writ denied.

Peter Gold, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General; Lance E. Winters, Senior Assistant Attorney General; Kenneth C. Byrne, Supervising Deputy Attorney General; Julia A. Harris, Deputy Attorney General, for Respondent.

_____

In a prior direct appeal, petitioner Brian McGee argued the trial court erred in denying several "*Wheeler/Batson* motions" that asserted the prosecutor had exercised peremptory challenges against African-American jurors in a discriminatory manner.  (See *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).)  We affirmed McGee's judgment of conviction, concluding that substantial evidence supported the trial court's finding that the prosecution had provided credible, race-neutral reasons for striking each prospective juror.  Although McGee requested that we conduct a "comparative juror analysis" to evaluate the prosecutor's justifications for the strikes, we concluded that then-controlling California Supreme Court precedent prohibited us from considering such evidence.  Approximately four years after we issued our decision, the Court clarified in *People v. Lenix* (2008) 44 Cal.4th 602 (*Lenix*) that reviewing courts must consider comparative juror analysis when evaluating a *Wheeler/Batson* claim.

In his current petition, McGee argues that, in light of *Lenix*, we are now compelled to consider his comparative juror analysis evidence.  He further contends that such evidence demonstrates the prosecutor acted with discriminatory intent.  We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Summary of Events Preceding McGee's Trial*

#### 1.  *Events preceding McGee's arrest*

In *People v. McGee* (2002) 104 Cal.App.4th 559 (*McGee I*), we set forth the following summary of facts:  "McGee (sometimes known as Geeter) lived in an apartment . . . with Linda Williams and Jonathan Bowen. Williams was dating Lee Anthony Lewis, who lived nearby with his mother. [¶] On the evening of December 3, 1998, Lewis went to the apartment to see Williams.  McGee answered the door, told Lewis to go away and closed the door.  Lewis did not leave and instead tried to get Williams's attention by shouting at her window. McGee and two friends, Charlie Mack and Larry Hamilton, then came out of the apartment and attacked Lewis for

2

'disrespecting' them. During the assault, Mack hit Lewis in the mouth with a handgun. McGee threatened Lewis not go to the police 'or he would kill him.'

"Williams heard the commotion and went outside to see Lewis. McGee and Mack forced her back into the apartment. Mack pointed the gun at her and said '"If you or your boyfriend go and tell the police, or call the police, we're going to kill you."' McGee repeated the threat to Williams, who ran out of the apartment in search of Lewis.

"Williams found Lewis down the street talking to the police. After Lewis reported the incident, the police escorted Lewis and Williams back to the apartment, where Lewis identified Mack and Hamilton as two of the attackers. Mack and Hamilton were placed under arrest.

"The police then accompanied Williams and Lewis to Lewis's house. Williams noticed McGee's uncle, George Adams, watching from a nearby corner. After the police departed, Adams knocked on the door. When Lewis answered, Adams said, '"Lee Anthony, man, you should have just left it alone"' and '"should have taken it like a man."'

"Seconds after Adams left, McGee burst into the Lewis residence and began shooting. After the shooting stopped, Williams told Lewis's mother, '"Geeter shot us, Geeter shot us."' When the police arrived, both Williams and Lewis told the officers they had been shot by McGee. [¶] Lewis died of multiple gunshot wounds to the chest and buttocks. Although she had been shot seven times, Williams survived and testified at trial.

"McGee was charged with one count of murder (Pen. Code, § 187), one count of attempted premeditated murder (Pen. Code, §§ 664, 187) and one count of making terrorist threats (Pen. Code, § 422). The information specially alleged Lewis had been intentionally killed because he was a witness to a crime (Pen. Code, § 190.2, subd. (a)(10))." (*McGee I*, *supra*, 104 Cal.App.4th at pp. 563-565.)

## 2. *Trial court proceedings*

During jury selection McGee's counsel "made a series of four motions under *Wheeler* and *Batson*, each of which was denied." (*McGee I*, *supra*, 104 Cal.App.4th at p. 565.)  The trial court denied McGee's first motion, finding he had failed to establish a prima facie case that the prosecutor exercised five peremptory challenges against African-American jurors in a "discriminatory fashion." (*Id.* at p. 566.)  After the prosecutor excused a sixth African-American juror, McGee brought a second *Wheeler* motion asserting that all six African-American jurors had been struck on the basis of their race.  The trial court found that McGee had only established a prima facie case of improper discrimination "'as to the last'" juror, and further found that the prosecutor had provided a credible, race-neutral basis for the juror's dismissal. (*Ibid.*)

"McGee's third motion was made after the prosecutor exercised two more peremptory challenges against African-American jurors.  At that point, the prosecutor had exercised eight out of nine peremptory challenges against African-Americans.  McGee's counsel argued, 'I believe that not only established a pattern but shows that the People are using their peremptory challenges in a discriminatory way.'  The trial court denied the motion, finding McGee had failed to make a prima facie showing the prosecutor had used the peremptory challenges because of race or other group bias." (*McGee I*, *supra*, 104 Cal.App.4th at p. 567.)

During the selection of alternate jurors, McGee made a fourth *Wheeler* motion after the prosecutor struck a ninth African-American juror.  "The court once again found no prima facie showing, but nonetheless invited comment from the prosecutor.  The prosecutor explained the last juror had been excused because she had several close relatives in prison.  The court said 'okay' and proceeded to complete jury selection." (*McGee I*, *supra*, 104 Cal.App.4th at p. 567.)  At the conclusion of jury selection, the prosecutor had exercised 11 peremptory challenges, of which nine (82 percent) excluded African-Americans from the jury.  The jury that tried the case included five (41 percent) African-Americans.

"The jury ultimately selected and sworn convicted McGee of murder and attempted murder, acquitted him of making terrorist threats and found true all the special allegations. He was sentenced to life in prison without the possibility of parole plus a consecutive sentence of 25 years to life on the murder count. He received a concurrent sentence of life imprisonment plus 25 years to life for the attempted murder conviction. . . . [¶] McGee filed a timely notice of appeal." (*McGee I*, *supra*, 104 Cal.App.4th at p. 567.)

### B. Post-Conviction Proceedings

#### 1. McGee I

In his appeal, McGee contended (among other things) that the trial court had "erred in ruling on his four *Wheeler* motions by (a) failing to find a prima facie case of race-based exclusion with respect to his first motion; (b) having found a prima face case with respect to his second *Wheeler* motion, failing to inquire into the reasons for *all* peremptory challenges to African-American jurors up to that point; and (c) failing to find a prima facie case with respect to his third and fourth *Wheeler* motions." (*McGee I, supra*, 104 Cal.App.4th at p. 567.)

In *McGee I*, we ruled that the trial court had failed to follow "required procedures" applicable to *Wheeler* claims. First, we concluded that when the court found a prima facie showing of discrimination had been made in relation to McGee's second *Wheeler* motion, it should have required the prosecutor to provide a race-neutral explanation for each of the six peremptory challenges that had been exercised against African-American jurors. The trial court, however, "erroneously" required only that the prosecutor provide a race-neutral explanation for "the most recent juror who had been excused." (*McGee I, supra*, 104 Cal.App.4th at p. 567.) We further concluded that this error had impacted McGee's ability to establish discriminatory intent on his third and fourth *Wheeler* motions.[1]

---

[1]     In *People v. Avila* (2006) 38 Cal.4th 491 (*Avila*), the California Supreme Court disapproved of *McGee I's* suggestion that "once the trial court has found a prima facie

We reversed the judgment and remanded the matter "to allow the trial court to conduct a new hearing on the *Wheeler* issues." (*McGee I, supra*, 104 Cal.App.4th at p. 573.)

### 2. *The trial court's re-hearing on McGee's Wheeler motions*

On remand, the trial court concluded that the prosecution had provided credible, race neutral reasons for each of the six African-American jurors who were the subject of McGee's second *Wheeler* motion.

On McGee's third and fourth motions, which addressed the dismissal of two additional African-American prospective jurors and a third African-American prospective alternative juror, the trial court found McGee had failed to establish a prima facie showing of discriminatory intent, but further explained that the prosecution had provided credible, valid reasons for the peremptory challenges.

Based on its findings, the trial court denied each of McGee's *Wheeler* motions and reinstated the judgment. McGee filed a second appeal.

### 3. *McGee II*

In his second direct appeal, McGee argued that the trial court had erred in denying each of his *Wheeler* motions. We first reviewed the trial court's finding that the prosecutor had provided credible, permissible reasons for challenging each of the African-American jurors who were the subject of the second *Wheeler* motion. McGee argued that, in conducting our evaluation of the prosecutor's explanations for each strike, we should compare the characteristics of the jurors who were struck with the

---

case of group bias in the excusal of one prospective juror, the burden shifts to the prosecutor to provide race-neutral explanations for all challenges to prospective jurors who are members of the same group." (*Id*. at p. 549.) The Court explained: "[W]hen a trial court determines that the defendant has made a prima facie showing that a particular prospective juror has been challenged because of such bias, it need not ask the prosecutor to justify his or her challenges to other prospective jurors of the same group for which the *Batson/Wheeler* motion has been denied. Accordingly, we disapprove of *People v. McGee, supra*, 104 Cal.App.4th 559 . . ., to the extent it is inconsistent with this holding." (*Id*. at pp. 549-550.) Neither party contends that *Avila's* holding has any effect on the specific issues presented in McGee's habeas petition.

6

characteristics of the jurors who had remained on the panel. McGee argued that this process—commonly known as "comparative juror analysis"—was a "'well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination.' [Citation.]" (*People v. McGee* (Nov. 15, 2004 B170336, 2004 WL 2580780 [nonpub. opn.] (*McGee II* ).)[2] We declined to engage in such an analysis based on then-controlling California Supreme Court precedent. (See *People v. Ervin* (2003) 22 Cal.4th 48, 76 (*Ervin*) ["a reviewing court will not engage in such a comparative analysis regarding persons the prosecutor accepted"].) We then proceeded to evaluate the prosecutor's reasons for dismissing each of the six African-American jurors, concluding that substantial evidence supported the trial court's findings that each explanation was both race-neutral and credible.

On McGee's third and fourth *Wheeler* motions, we concluded that the transcript from the remand hearing demonstrated that the "the trial court erred by conducting its inquiry in the reverse order on the third [and fourth] *Wheeler* motion[s]. It first heard the prosecutor's reasons for the peremptory challenges, then determined that there was no prima facie case." (*McGee II, supra*, 2004 WL 2580780 at * 10.) We nonetheless concluded that, under such circumstances, it was proper to infer that the court had "impliedly found a prima facie case on the third [and fourth] *Wheeler* motion[s] but, upon hearing the prosecutor's reasons, ultimately found the peremptory challenges to be constitutionally valid." (*Ibid*.)

We then considered the prosecutor's reasons for excusing the three African-American jurors who were the subject of the third and fourth *Wheeler* motions and again found that "[t]he record on voir dire and on rehearing, considered as whole, . . . [contained] [s]ubstantial evidence support[ing] the trial court's finding the prosecutor's

---

**2** Although we are generally prohibited from citing unpublished California opinions as legal authority, we may appropriately cite our prior decision "to explain the factual background of the case" and when relevant under the doctrine of "law of the case." (*Pacific Gas and Electric Co. v. City & County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10; see also Cal. Rules of Court, rule 8.1115(b)(1); *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 443, fn. 2.)

explanation for [his] challenges were genuine and the jurors were not excused on the basis of membership in a cognizable group." (*McGee II, supra*, 2004 WL 2580780 at \* 13.)  On January 19, 2005, the California Supreme Court denied McGee's petition for review.

### C. Federal Habeas Proceedings

On July 12, 2005, McGee filed a federal petition for writ of habeas corpus under 28 U.S.C. section 2254 arguing that that we had erred in upholding the trial court's denial of his *Wheeler* motions.

#### 1. District court order granting McGee's habeas petition

Approximately five years after McGee filed his petition, the district court issued a published opinion concluding that our "findings that the prosecutor's reasons were race-neutral was an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' [Citation.]" (*McGee v. Kirkland* (C.D. Cal. 2010) 726 F.Supp.2d 1073, 1087 (*McGee III*).)

The district court initially considered our decision not to conduct a comparative juror analysis, which the court described as being "consistent with [controlling] state law at the time." (*McGee III, supra,* 726 F.Supp.2d at p. 1080.)  The district court concluded the United States Supreme Court's decision in *Miller-El v. Cockrell* (2003) 537 U.S. 322 (*Miller-El*) clarified that when evaluating a prosecutor's reasons for exercising a peremptory challenge, courts must consider "not only the prosecutor's statements about his jury selection strategy and his explanations for the peremptory strikes, but also the characteristics of the venire members that were not challenged." (*McGee III, supra,* 726 F.Supp.2d at pp. 1079-1080.)  In light of *Miller-El*, the court found that our refusal to consider comparative juror analysis evidence was contrary to "clearly established federal law, which was in existence by the time of [McGee's] last reasoned state court decision in 2004." (*Id.* at pp. 1080-1081.)

The district court then conducted a de novo analysis of the "prosecutor's stated reasons for striking" two jurors: juror 4046 and juror 9974.  (*McGee III, supra,* 726

F.Supp.2d at pp. 1083.) The court found that, in both instances, the prosecution's stated reasons were "unsupported by the record and/or fail after conducting a comparative analysis." (*Ibid*.) The court noted that although the prosecutor had allegedly struck juror 4046 based on the fact that she had no jury experience despite her advanced age, "[a]t least one other person of advanced age, a retired truck driver who had never served on a jury before, remained on the jury." (*Ibid*.) The court also concluded that several other reasons the prosecution had offered—including the juror's failure to "'stand up' when her house was burglarized," her reluctant demeanor, her lack of educational background and her failure to explain her children's unemployed status—were either unsupported by the record, shared by other jurors who remained on the panel or were otherwise irrelevant to the juror's ability to serve on the panel. (*Id*. at pp. 1083-1085.)

The district court also found that the prosecutor's sole reason for striking Juror 9744—having several relatives who were incarcerated—was "implausible" because the prosecutor had "fail[ed] to object to other panel members who gave similar responses to the . . . family criminal history question." (*McGee III, supra*, 726 F.Supp.2d at pp. 1086-1087.) The court found that because other jurors had likewise admitted they had family members with a criminal history, the prosecutor's explanation "served only as a pretext for purposeful discrimination." (*Id*. at p. 1087.)

Finally, the court noted that other evidence suggested discriminatory intent, including the fact that "the prosecutor used nine of his eleven peremptories, or 82%, against black venire members." (*McGee III, supra*, 726 F.Supp.2d at p. 1090.)

### 2. *Ninth Circuit's reversal of the district court's ruling*

On January 28, 2013, the Ninth Circuit reversed the district court's grant of McGee's habeas petition, concluding that "[t]he California Court of Appeal's denial of McGee's *Batson* claim was not an 'unreasonable determination of the facts in light of evidence' in the record. [Citation.] Although comparative juror analysis suggests that the state courts may have 'had reason to question the prosecutor's credibility,' such analysis 'does not . . . compel the conclusion that the trial court had no permissible

9

alternative but to reject the prosecutor's race-neutral justifications.' [Citation.]" (*McGee v. Kirkland* (9th Cir. Jan. 28, 2013) 506 Fed.Appx. 588, 590 (*McGee IV*).)

In response to the district court's analysis of juror 4046, the Ninth Circuit explained: "The prosecutor provided three reasons for excusing Juror 4046 from the jury: (1) her lack of jury experience; (2) her job as a 'substitute cafeteria helper,' from which the prosecutor inferred she might lack the education and ability to understand fully a complex murder trial; and (3) that she 'demonstrated . . . that she was timid, . . . not detail oriented, and potentially unable to contribute to the jury deliberations.' These justifications are race-neutral and supported by the record. Although the prosecutor accepted some jurors without previous jury experience, several others without such experience were stricken. Juror 4046's lack of jury experience was connected to the prosecutor's overarching concern—that she might not be able to fulfill effectively the obligations of a juror. It was not unreasonable, therefore, for the California courts to conclude that the prosecutor challenged Juror 4046 based on this race-neutral concern." (*McGee IV, supra*, 506 Fed.Appx. at p. 590.)

In response to the district court's analysis of juror 9744, the Ninth Circuit explained: "The California courts' conclusion that the prosecutor's challenge of Juror 9744 was not based on race was also reasonable. The prosecutor stated that he struck Juror 9744 because of 'the large number of [her] relatives [who were] in prison.' This is a permissible, race-neutral reason, substantiated by the record. [Citations.] Although the prosecutor accepted some jurors whose relatives had been convicted of crimes, prosecutors often attempt to ensure that juries have few, if any, such individuals. The record indicates that the venire contained a large number of prospective jurors who themselves had criminal convictions or who had relatives with criminal convictions. Juror 9744, excused during the selection of alternate jurors, was the last African-American prospective juror stricken by the prosecutor. It was not unreasonable of the California courts to accept as race-neutral the prosecutor's desire not to add another juror whose relatives had criminal convictions to a jury that already had several such jurors." (*McGee IV, supra*, 506 Fed.Appx. at pp. 590-591.)

10

The Ninth Circuit also concluded that the record contained additional evidence supporting our rejection of McGee's *Wheeler* claims, including the fact that "five of the seated jurors were African-American[, which was] . . . 'indicative of a nondiscriminatory motive.'" [Citations.] In addition, the prosecutor twice accepted the jury while it contained some of the jurors who were eventually excused, further undermining any inference of racial discrimination. [Citation.]" (*McGee IV, supra*, 506 Fed.Appx. at p. 591.) Finally, the Ninth Circuit noted that "although the precise racial composition of the venire is not in the record, the record strongly suggests that the venire contained a large number of African–American prospective jurors. Therefore, it is unsurprising that a large percentage of the excused jurors were African-American, diminishing any inference of racial motivation that may ordinarily be drawn from that circumstance." (*Ibid*.)

The Ninth Circuit remanded the matter to the district court for consideration of additional arguments McGee had raised in his federal petition. The district court denied the petition in an unpublished disposition on May 20, 2013.

### D. *McGee's State Court Habeas Petitions*

On July 16, 2013, McGee filed a petition in the superior court, which was denied. He subsequently filed the current petition, arguing that, in *McGee II*, we improperly "den[ied] [his] *Batson/Wheeler* motions without conducting a comparative juror analysis." McGee contends that "subsequent authority from the California Supreme Court [now] makes clear that in determining whether a prosecutor has struck prospective jurors for discriminatory reasons, a reviewing court must conduct a comparative juror analysis." He further contends that "[d]oing so in this case exposes the prosecutor's stated reasons for his strikes against African-Americans as mere pretexts for purposeful discrimination."

11

## A. *Summary of Applicable Law*

### 1. *Analytical framework governing Wheeler/Batson claims*

"A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. [Citation.] Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. [Citation.] Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices. [Citation.] Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. [Citation.] This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' [Citation.]" (*Rice v. Collins* (2006) 546 U.S. 333, 338.) This three-step procedure "also applies to state constitutional claims" under *Wheeler, supra,* 22 Cal.3d 258. (*Lenix, supra*, 44 Cal.4th at p. 613.)[3]

"A prosecutor asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]." (*Lenix, supra*, 44 Cal.4th at p. 613.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.

---

**3**    In his petition, McGee argues only that the trial court erred in performing the third stage of the *Wheeler/Batson* analysis.

Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*Lenix, supra*, 44 Cal.4th at p. 613 [footnote omitted].)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal.4th at pp. 613-614 [footnote omitted].)

### 2. *Summary of "comparative juror analysis"*

"[C]omparative juror analysis is a form of circumstantial evidence" (*Lenix, supra*, 44 Cal.4th at p. 621) whereby the court conducts a "'side-by-side comparison" (*Miller-El, supra*, 545 U.S. at p. 241) of dismissed minority panelists with non-minority panelists who were allowed to serve. "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar non-[minority panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." (*Ibid.*; *Lenix, supra*, 44 Cal.4th at p. 621.)

As explained in *McGee II*, at the time we decided McGee's direct appeals, our Supreme Court had repeatedly held that "[t]he rule . . . in [California] . . . [is] . . . that in evaluating the sufficiency of the prosecutor's explanations [for exercising a peremptory

challenge], a reviewing court will not engage in such a comparative analysis regarding persons the prosecutor accepted. [Citations.]" (*Ervin, supra,* 22 Cal.4th at p. 76.) Several years after we affirmed McGee's judgment of conviction the Court issued *Lenix, supra,* 44 Cal.4th 602, which held that two United States Supreme Court decisions —*Miller-El, supra,* 545 U.S. 231, and *Snyder v. Louisiana* (2008) 552 U.S. 472—made clear that "[c]omparative juror analysis is evidence that . . . . must be considered when reviewing claims of error at *Wheeler/ Batson's* third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons. In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*Lenix*, *supra,* 44 Cal.4th at p. 607.)

*Lenix* emphasized, however, that "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Lenix*, *supra,* 44 Cal.4th at p. 622.) The Court directed reviewing courts to remain "mindful that comparative juror analysis on a cold appellate record has inherent limitations. [Citation.]. . . . There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. . . . "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record.' [Citation.]." (*Ibid.*)

*Lenix* further clarified that while appellate courts must consider comparative juror analysis when such evidence is relied on by the defendant, we still "accord significant deference to the [trial court's] factual findings on the question of discriminatory intent" (*Lenix, supra,* 44 Cal.4th at p. 626) and "'examin[e] only whether substantial evidence supports its conclusions.' [Citation]." (*People v. Montes* (2014) 58 Cal.4th 809, 847 (*Montes*).)

14

## B. McGee Is Not Procedurally Barred from Pursuing Habeas Relief Predicated on Comparative Juror Analysis

The People initially contend there are two reasons McGee is procedurally barred from pursuing a habeas claim predicated on comparative jury analysis. First, the People assert his claim is untimely because it was filed more than five years after *Lenix* was decided. Second, the People argue that even if McGee's claim is timely, the rule set forth in *Lenix* does not apply retroactively to cases that became final before it was decided.[4]

### 1. McGee established good cause for the delay in filing his petition

"[C]laims raised in a habeas corpus petition must be timely filed." (*In re Robbins* (1998) 18 Cal.4th 770, 778.) "Our rules establish a three-level analysis for assessing whether claims in a petition for a writ of habeas corpus have been timely filed. First, a claim must be presented without substantial delay. Second, if a petitioner raises a claim after a substantial delay, we will nevertheless consider it on its merits if the petitioner can demonstrate good cause for the delay. Third, we will consider the merits of a claim presented after a substantial delay without good cause if it falls under [certain] narrow exceptions." (*Reno, supra*, 55 Cal.4th at p. 460.)

McGee does not dispute he failed to present his claim without substantial delay, acknowledging that *Lenix* was decided approximately five years before he filed his petition. (See *Reno, supra*, 55 Cal.4th at p. 461 ["Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the

---

[4]    Ordinarily "[l]egal claims that have previously been raised and rejected on direct appeal . . . cannot be reraised in a collateral attack by filing a petition for a writ of habeas corpus." (*In re Reno* (2012) 55 Cal.4th 428, 476 (*Reno*).) However, a "petitioner can renew a legal issue, despite having raised the issue unsuccessfully on appeal, in [certain] circumstances[, including] . . . . 'when there has been a change in the law affecting the petitioner' [Citation.]." (*Id*. at p. 478.) Although the parties do not directly address the issue, it is apparent that McGee's petition falls within this exception. McGee raised the *Batson/Wheeler* issues in his direct appeals and specifically implored this court to consider evidence of comparative juror analysis. Although the then-controlling law in this state prohibited us from conducting a comparative juror analysis, *Lenix* has since clarified that we must conduct a comparative analysis when the defendant has relied on such evidence.

15

information offered in support of the claim and the legal basis for the claim"].)  McGee contends, however, that his federal habeas petition, which was filed several years before *Lenix* was decided and not resolved by the federal courts until 2013, constitutes good cause for the delay.

We agree that the unique procedural history of this case constitutes good cause for McGee's five year delay in seeking state habeas relief.  The record shows that promptly after his criminal conviction became final in 2005, McGee pursued a federal habeas petition asserting that the California courts' refusal to consider evidence of comparative juror analysis constituted an unreasonable application of federal law.  The district court, however, did not decide McGee's petition until 2010.  The federal appellate process lasted several more years, ultimately resulting in an order denying his petition that was issued in May of 2013.  McGee then promptly pursued a state habeas petition, which he filed less than two months after the denial of his federal petition.

The People argue that, despite his then-pending federal habeas petition, McGee should have filed his state habeas petition immediately after *Lenix* was decided in 2008.  We disagree.  McGee should not be punished for what was, in effect, an attempt to avoid a multiplicity of identical habeas petitions; had his federal petition been successful (as it was in the district court), he would not have needed to pursue a state habeas petition.  The United States and California Supreme Courts have both emphasized that "collateral challenges to final criminal judgments exact a heavy cost on the judiciary."  (*Reno, supra*, 55 Cal.4th at p. 452; *McCleskey v. Zant* (1991) 499 U.S. 467, 491 ["Federal collateral litigation places a heavy burden on scarce federal judicial resources, and threatens the capacity of the system to resolve primary disputes"].)  Forcing petitioners to simultaneously pursue identical habeas claims in state and federal court under the circumstances presented here would only serve to exacerbate these burdens.  We therefore conclude McGee has demonstrated good cause for his delay.

16

## 2. *Lenix is applicable to McGee's case*

The People next contend that the "rule announced in *Lenix* . . . should not apply retroactively" to McGee, whose judgment became final several years before the case was decided. "In determining whether a decision should be given retroactive effect, the California courts undertake first a threshold inquiry, inquiring whether the decision established new standards or a new rule of law. If it does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises." (*Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 36.) Thus, if *Lenix* merely "elucidates prior law, but does not establish a new rule or standard, its principles are applicable to petitioner's case even though the judgment became final . . . before [*Lenix* was decided.]" (*In re Bower* (1985) 38 Cal.3d 865, 877, fn. 6.)

In *Lenix*, our Supreme Court explicitly found that the United States Supreme Court decision in *Miller-El* did not "change[] the *Batson* standard." (*Lenix, supra*, 44 Cal.4th at p. 621.) The decision merely clarified that, contrary to the California Supreme Court's prior holdings, comparative juror analysis is a form of relevant evidence that reviewing courts must consider when applying the third step of the *Batson* analysis. (*Id.* at p. 622; see also *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, 1146 [concluding that *Miller-El* applies retroactively because it did not "create a new rule of criminal procedure. Instead, it simply illustrates the means by which a petitioner can establish, and should be allowed to establish, a *Batson* error"].) Given *Lenix's* explicit acknowledgment that its ruling merely served to clarify the procedures governing *Batson* claims, we conclude that its principles apply to McGee.

## C. *Comparative Juror Analysis Evidence Does Not Demonstrate that the Prosecutor Acted with Discriminatory Intent*

The narrow issue presented in this habeas proceeding is whether the comparative juror analysis set forth in McGee's petition, considered in conjunction with other relevant

17

evidence in the record, demonstrates that the prosecutor's explanations for exercising peremptory challenges against several African-American jurors were pretextual.[5]

Before assessing McGee's comparative juror analysis of each excused African-American juror, we note several factors that generally support the trial court's factual finding of no discriminatory intent. First, as discussed in *McGee II*, this court has already concluded that: (1) the prosecutor provided permissible, race-neutral reasons for challenging each of the nine African-American prospective jurors; and (2) in the absence of the comparative juror analysis evidence discussed below, substantial evidence supported the trial court's finding that the prosecutor's explanation for his challenges were genuine.

Second, as we noted in *McGee II*, while the prosecution's peremptory challenge to nine African-American prospective jurors is significant, five African-Americans sat on the jury that convicted McGee. "The presence of these jurors on the panel is one indication of the prosecutor's good faith in exercising his peremptory challenges to exclude the African-American prospective jurors in question."[6] (*Montes, supra,*

---

[5] McGee's habeas petition includes several arguments regarding his *Wheeler* motions that are unrelated to the issue of comparative juror analysis. He asserts (among other things) that several of the prosecutor's reasons for exercising his peremptory challenges were "unsupported by the record" and irrelevant to the prospective juror's ability to serve on the panel. McGee has not explained why these arguments could not have been raised on direct appeal. We therefore decline to address the claims. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 ["The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"].)

[6] The record suggests that at the time the jury was sworn, the prosecutor retained a sufficient peremptory challenges to excuse each of the five African-American jurors who remained on the jury panel. Because McGee was charged with murder and attempted premeditated murder, both punishable by a life term (Pen. Code, §§ 190 & 664 subd. (a)), the prosecutor had 20 peremptory challenges. (See Code Civ. Proc., § 231, subd. (a) ["if the offense charged is punishable with . . . imprisonment in the state prison for life, the

18

58 Cal.4th at p. 848 [presence of "three African-Americans . . . seated on the jury" supported trial court's finding of non-discriminatory intent]; *People v. Stanley* (2006) 39 Cal.4th 913, 938, fn. 7 ["'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection'"].)

Third, McGee does not dispute that the prosecutor had twice accepted the jury while it included several of the same African-American jurors who were later excused, further undermining any inference of racial discrimination. (See *People v. Williams* (2013) 56 Cal.4th 630, 659 [although "not conclusive," the prosecutor's decision to "pass[]" on African-American juror who was later challenged qualified as circumstantial evidence of nondiscriminatory intent]).

We now consider whether, despite such evidence, a comparative juror analysis demonstrates the trial court erred in accepting the prosecution's proffered, race-neutral reasons for utilizing peremptory challenges against each of the individual African-American jurors.

### 1. *Juror 4046*

#### a. *Summary of trial court proceedings*

Juror 4046 was a "substitute cafeteria helper" with four daughters, only one of whom was employed. In her voir dire responses, juror 4046 stated that she had "never done jury duty before" and that her home was burglarized "four or five times." Although she reported each incident to law enforcement, no arrests were ever made.

At the *Wheeler* hearing, the prosecutor identified "numerous reasons" he did not believe juror 4046 would make "a good juror," including: (1) despite her advanced age, she had no prior jury experience; (2) her current employment as a cafeteria helper suggested she had limited education, making her ill suited for a complex murder trial; (3)

---

defendant is entitled to 20 and the people to 20 peremptory challenges"].) When the jury was sworn, the prosecutor had used only 9 of these 20 peremptory challenges.

her voir dire responses suggested she was "timid, not detail oriented and potentially unable to contribute to the jury deliberations."

In a memorandum opposing McGee's *Wheeler* claims, the prosecution expounded on the third factor, asserting: "[The juror] indicated that her home was robbed 'at least four or five times.' [] Often times, jurors recount with great detail the horror of having their home burglarized . . . For [this juror] to have lost track of the number of times her home was invaded, and then coupled with relatively large number of times her home was burglarized, suggested to the prosecutor that [she] was not focused on reducing such activity in her neighborhood or her life. . . ." The prosecutor further explained that the juror had stated three of her four daughters were unemployed, but "did not attempt to explain the unemployment. . . . [H]er failure to clarify the status of [their unemployment] reflected negatively upon this potential juror." Finally, the prosecutor noted juror 4046 was the first juror that he had challenged.

The trial court accepted the prosecution's explanation that the juror had been stricken based on her apparent limited educational background: "Her being a cafeteria helper, I think the people can infer from that possibly she didn't have a lot of education and would not be able to evaluate all the issues the way that they would like to see her evaluate them. It appears to me that the strike was based on non-race grounds."

### b. *McGee's comparative juror analysis of juror 4046 does not demonstrate discriminatory intent*

McGee argues a comparative juror analysis demonstrates that each of the prosecutor's purported reasons for striking juror 4046 were pretext for discrimination. First, McGee contends that while the prosecutor asserted it was "unusual Juror 4046 did not elaborate about the burglaries of her home, . . . [the record shows] that two-thirds [of prospective jurors who reported having been the victim of burglaries] did not elaborate [on the specific circumstances of their crimes]." The prosecutor's statements about juror 4046 make clear, however, that he was not merely concerned about her failure to provide specific details regarding each burglary. Rather, the prosecutor was concerned the juror

could not even recall the specific number of times she had been burglarized which, when combined with her inability to recall the specific details of each event, suggested she was not detail oriented and timid. McGee has identified no other juror who shared such attributes. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 107 (*DeHoyos*) [rejecting comparative juror analysis where "[n]one of the jurors [identified] . . . . by defendant expressed a substantially similar combination of [characteristics as the stricken prospective juror]"].)

McGee next asserts that although the prosecutor alleged he had concerns that three of juror 4046's daughters were unemployed, "[t]he prosecutor had absolutely no unemployment-related worries about Juror 3997, who 'chooses to be unemployed,' nor about the adult, college educated son of Juror 4645, who was also unemployed by choice. [] The prosecutor's apprehension about unemployment . . . should have sparked concerns about these jurors, but the record reflects none." This argument misstates the prosecutor's explanation regarding juror 4046's unemployed daughters. The prosecutor did not state that he challenged juror 4046 because she had three unemployed daughters; he stated that the juror's failure to explain why her daughters were unemployed provided further evidence that she was not detail oriented. The two accepted jurors McGee identifies did provide such information during voir dire: juror 3997 explained that her unemployed son was backpacking through Europe; juror 4645 explained that he had served as an executive at a private management company for nine years, but recently left the job and chose to remain unemployed.

Moreover, to the extent McGee's "comparative juror analysis" may cast doubt on some of the prosecutor's reasons for excusing juror 4046, McGee has ignored other reasons that were provided in support of the peremptory challenge. First, as explained by the trial court, the prosecutor stated that juror 4046's position as a cafeteria helper suggested her education level might hinder her ability to serve as a juror in a complex criminal matter. Our Supreme Court has previously held that perceived lack of education is a permissible, race-neutral ground for exercising a peremptory challenge. (*See People v. Reynoso* (2003) 31 Cal.4th 903, 924 (*Reynoso*) [prosecutor's subjective opinion that a

21

customer service representative lacks educational experience to effectively serve as a juror may properly form the basis of a peremptory challenge].) The Court has also made clear that "[w]hether a prosecutor's generalizations about a given occupation have any basis in reality or not, a prosecutor 'surely . . . can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected.' [Citation.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1317 (*Chism*).)

McGee's comparative analysis also ignores the prosecutor's stated concern that, despite her advanced age, juror 4046 lacked any jury experience. Again, our Supreme Court has explicitly found that lack of "prior jury experience . . . [is a] legitimate, nondiscriminatory ground[] for exercising a peremptory challenge." (*People v. Manibusan* (2013) 58 Cal.4th 40, 82.)[7]

### 2. Juror 3744

#### a. Summary of trial court proceedings

Juror number 3744 was an unmarried "mail processor" employed at the UCLA Medical Center. The juror had one son who was in prison and no prior jury experience. During voir dire, juror 3744 explained that her son had been convicted of "robbery, rape and drugs [sic]" and was currently serving a life sentence. When asked whether she

---

[7] McGee does reference juror 4046's purported lack of education and jury experience in arguments set forth in two footnotes, neither of which contains citation to any legal authority. We need not address issues discussed only in a footnote. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2; see *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.) Moreover, the footnotes simply assert that other jurors who the prosecutor passed on either lacked jury experience or held "non-technical occupations . . . from which it might be . . . assumed they did not have an extensive education training." These conclusory statements fail to show that any of these other prospective jurors shared the combination of factors that juror 4046 exhibited, which included lack of education, lack of jury experience and voir dire answers suggesting lack of attention to detail. (See *DeHoyos, supra,* 57 Cal.4th at p. 107 [rejecting comparative juror analysis where "[n]one of the jurors [identified] . . . . by defendant expressed a substantially similar combination of [characteristics as the stricken prospective juror]"].)

22

believed her son had been treated "fairly or unfairly," she responded "I think he was treated unfairly," explaining that he did not get "the right representation." The juror was asked whether she believed she could "put[] aside whatever happened to your son and be[] a fair juror to both sides in this case." After hesitating and asking questions about the specific nature of McGee's alleged crimes, the juror stated that she "th[ought]" she "could be fair."

The prosecutor explained he struck juror number 3744 for two reasons. "First, [the juror] was a mail processor for UCLA, a job that would seem similar to working for the post office. The tedious nature of working with millions of pieces of mail causes the prosecutor to believe that a juror with this occupation would not be used to listening and focusing on the numerous details associated with sitting on a jury. Furthermore, analysis of those details may be difficult for a person employed in this capacity. . . . Second, [the juror] indicated that her son was in prison for robbery, rape, and drugs. She stated that he was treated unfairly. The prosecutor believed that a juror with this personal history would cloud this case with her son's case and thus not be a fair juror to [the] People."

The trial court accepted the prosecutor's second reason for striking the juror, explaining: "This is a situation where the people are prosecuting an individual accused of a crime. Here's a juror who has a son who is in prison for robbery and rape and drugs and feels that he was treated unfairly. I think any prosecutor would be concerned regardless of what the race of that particular juror was. It certainly is a legitimate concern and a legitimate reason for challenging that juror and it is not related to race."

### b. McGee's comparative juror analysis of juror 3744 does not demonstrate discriminatory intent

McGee argues that a comparative juror analysis demonstrates the prosecutor's assertion that he struck juror 3744 because of his position as a "mail processor" was pretext for discrimination. In support, McGee relies on a statement the prosecutor made at the *Wheeler* hearing in which he explained that he had experienced problems with juries that included persons "employed by the United States Postal Service or . . . by L.A.

23

Unified School District. . . . Basically, I've had problems with teachers and mail carriers. That is as unscientific as that may seem, it is the nature of the occupation. Sometimes renders it difficult for them to render a decision in cases such as this [*sic*]." McGee argues that while the prosecutor elected to strike juror 3744 based on his status as a mail processor, he elected to leave several "teachers" on the jury. McGee contends this demonstrates pretext because "the prosecutor did not explain . . . why he accepted numerous teachers as jurors . . . despite equating them with mail carriers in their difficulty rendering decisions."

There are two problems with this analysis. First, McGee concedes the prosecutor did not accept any juror who was employed as a mail carrier or processor. While it is true the prosecutor made passing references to teachers during the *Wheeler* hearing, he made clear that his concerns with juror 3744's occupation arose from the "tedious" nature of mail delivery. (See *People v. Trinh* (2014) 59 Cal.4th 216, 242 (*Trinh*) [permitted exercise of a peremptory challenge based on a prospective juror's "occupation as a postal worker"].) Although the prosecutor might have harbored other concerns about teachers, the fact the prosecutor left several teachers on the jury is not evidence that his reasons for striking juror 3744 was pretextual. (*DeHoyos, supra*, 57 Cal.4th at p. 107 ["In order for a comparison to be probative, jurors need not be identical in all respects [citation], but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge"].)

Second, McGee's argument ignores the second proffered reason for the prosecutor's peremptory challenge: juror 3788's statement that her son had been treated unfairly by the system. The trial court found that this race-neutral explanation was credible. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 70 ["any prosecutor" would be expected to utilize peremptory challenge against prospective juror with "personal experience with an allegedly unfair homicide prosecution of a close relative"] [disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22]; *People v. Jones* (2013) 57 Cal.4th 899, 920 ["'a prosecutor may reasonably surmise that a

close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution.' [Citation.]"].)

### 3. Juror 3378

#### a. Summary of trial court proceedings

Juror 3378 had no prior jury experience, was divorced and had two young children. At voir dire, the juror explained that she had been raped at gunpoint six years earlier. She also stated that she never reported the crime because her perpetrators had threatened to kill her. Juror 3378 also informed the court that one of her cousins was incarcerated for robbery and that she believed he should have gotten a longer sentence. She further reported that a second cousin had been murdered four years earlier and that the suspects charged with the killing should have received harsher punishments.

In the People's written opposition to McGee's *Wheeler* motion, the prosecutor explained he struck juror 3378 because "the charges in the present case involved witness intimidation and violence thus making it impossible, in the prosecutor's analysis, for [the juror] to separate her experiences with the facts in this case. This case appeared too similar to a terrible episode in her life and the prosecutor felt [the juror] was not suited to sit as a juror on this type of case. [¶] Additionally [the juror] had strong opinions about how her cousin who committed robbery and those that were charged in her cousin's death should have been treated. It appeared possible that the issue of punishment would have weighed heavily on this juror's mind, thus making the prosecutor feel unsure that this juror would deliberate appropriately. . . . Because [the juror] had never served jury duty before, she may have had trouble separating this case from the crimes in her life and in the lives around her."

The court ruled the prosecutor had provided a genuine, race-neutral basis for challenging the juror: "We have here a juror who has family members involved in crime, serious crimes for that matter. She herself was the victim of a crime and was personally intimidated . . . by the perpetrators. [Although] . . . one might think [those incidents would make her] a good juror for the prosecution[,] . . . the People had to weigh what

effect would it have that you have family members involved in crime? . . . If you are part of a family that is involved in crime, you may look at everything totally different from someone who's in a family that's not involved in crime. I think different lawyers would evaluate it differently, but it seems to me the fact that she does have these individual family members involved in serious crimes that's certainly a legitimate reason to strike her from the panel."

> b. *McGee's comparative juror analysis of juror 3378 does not demonstrate discriminatory intent*

McGee argues that a comparative juror analysis demonstrates the trial court erred in accepting the prosecutor's assertion that he struck juror 3378 because "she had relatives and friends who had been victims or perpetrators of crime." According to McGee, the voir dire record demonstrates that: (1) "[m]ost of the prospective jurors had close relatives who were crime victims or they had been victims themselves"; and (2) the prosecutor accepted numerous jurors who had "family members with criminal backgrounds." McGee also asserts that the prosecutor's concerns about juror 3378's "strong opinions" regarding the sentencing of her cousin and the individuals who murdered her other cousin were not credible because the prosecutor subsequently preserved juror number 9694, who had exhibited a "strong opinions" about the criminal process. Moreover, juror 9694 also had family and friends who were incarcerated for violent crimes and also believed a close friend had been treated unfairly during a murder trial.

McGee's comparative evidence ignores the primary reason the prosecutor provided in support of the peremptory challenge to juror 3378: the juror had been the victim of a crime that was similar to the acts McGee had allegedly committed in this case; specifically, she was subjected to a violent crime at gunpoint and then told she would be killed if she reported the incident. The prosecutor explained that this similar experience, combined with the juror's lack of prior jury service, might make it difficult for her to deliberate appropriately. We conclude that the juror 3378's lack of jury

26

experience, combined with having been the victim of a substantially similar crime, differentiates her from jurors who had family members who were victims or perpetrators of criminal activity or who had expressed strong opinions about the legal system.

### 4. Juror 6072

#### a. Trial court proceedings

Juror 6072 was unmarried, had no jury experience and had recently obtained a bachelor's degree in political science. During voir dire, the juror informed the court he had been arrested for petty theft approximately one-and-half to two years ago and believed he was still on "summary probation." He had also been arrested for "possession of stolen goods" four year earlier, which resulted in "community service" and a year of "summary probation."

The prosecution informed the court he had struck juror 6072 because the juror "had no prior jury service and had been convicted of two crimes of moral turpitude, petty theft and receiving stolen goods. [These] convictions caused the prosecutor to believe [the juror] would sympathize with the defendant in this case."

The trial court found this explanation credible, noting that the People had the right "to strike an individual with that kind of background. Juror's still on summary probation. It is that recent."

#### b. McGee's comparative juror analysis of juror 6072 does not demonstrate discriminatory intent

McGee argues that the prosecution's purported reason for striking juror 6072—two prior convictions for crimes of moral turpitude and his current probationary status—were pretext for discrimination because the prosecution did not strike jurors 3997 and 8755, who had both been convicted of driving while under the influence of alcohol.

The two jurors McGee has identified are not substantially similar to juror 6072 because they had each suffered only a single conviction, their crimes were committed many years before the voir dire proceeding and neither was currently on probation. Juror 3997 was convicted approximately nine years before the trial court proceeding; juror

27

8755 was convicted 18 years before the proceeding. In contrast, juror 6072 had committed multiple crimes of moral turpitude in the past four years and was still on probation for the second offense.

### 5. Juror 9833

#### a. Trial court proceedings

Juror 9833 was unmarried, had no prior jury experience and worked for the "U.S. Postal Service." The juror had her home burglarized once and had never witnessed a crime. The prosecutor did not ask her any questions at voir dire.

The prosecutor provided two reasons for striking juror 9833. First, as with dismissed juror 3744 (discussed above), the prosecutor explained that in his experiences the occupation of a "postal worker" made it "difficult . . . to render a decision in a case such as this." Second, the prosecutor noted that the juror had answered "yes" to very few of the questions posed to her during voir dire and exhibited a "reluctan[t]" demeanor that suggested she was "holding back."

The court found these explanations credible, explaining: "Again, we revisit the issue of a postal worker. I think I stated . . . that it is a well-known theory on the part of some prosecutors, and my experience it [*sic*] doesn't really seem to matter what race the postal worker comes from, whether it's a valid theory or not, they seem to believe that and I don't think that postal workers are necessarily a cognizable class. And I . . . do remember she appeared to be a little reticent. And it is just her demeanor. It is not anything she said or didn't say. It was just her demeanor. . . . I . . . find . . . it was not race based and he had legitimate reasons for challenging her."

#### b. McGee's comparative juror analysis of juror 9833 does not demonstrate discriminatory intent

McGee argues that a comparative analysis demonstrates the prosecution's assertion he struck juror 9833 as a result of her status as a postal worker was not credible. As with juror 3744, McGee again relies on the prosecutor's statement at the *Wheeler* hearing that he had experienced problems with both postal workers and teachers, but

28

nonetheless left several teachers on the jury. McGee also contends that a comparative analysis shows that numerous other prospective jurors who were left on the jury answered "yes" to few if any of the trial court's questions at voir dire.

We reject McGee's first argument for the reasons stated in relation to juror 3744. The mere fact that the prosecutor made negative comments about both teachers and postal workers does not mean that juror 9833 was similarly situated to prospective jurors who were teachers. The prosecutor provided an explanation why he believed postal workers, in particular, were ill suited to serve as jurors: the tedious nature of their work. Regardless of whether those subjective beliefs had "any basis in reality," they nonetheless provided a permissible basis for exercising a peremptory challenge. (See *Trinh, supra,* 59 Cal.4th at p. 242 [permitting exercise of a peremptory challenge based on a prospective juror's "occupation as a postal worker"]; *Chism, supra,* 58 Cal.4th at p. 1317 [permitting prosecutor challenge based on subjective beliefs about occupation].)

McGee's second argument fails because he has not demonstrated that any of the other jurors who answered "yes" to few of the court's voir dire questions also exhibited a "reluctant" demeanor suggesting that they might be holding something back. "It is well settled that '[p]eremptory challenges based on counsel's personal observations are not improper' [Citation.]." (*Reynoso, supra,* 31 Cal.4th at p. 917.) Indeed, "'race-neutral reasons for peremptory challenges often invoke a juror's demeanor. . . . In this situation, the trial court must evaluate . . . whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. . . . [T]hese determinations of credibility and demeanor lie "'peculiarly within a trial judge's province."' [citations], and . . . "in the absence of exceptional circumstances, we . . . defer to [the trial court on such issues].' [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal.4th at p. 614.) Because McGee has identified no "exceptional circumstance" that would warrant a rejection of the trial court's own observations regarding juror 6072's demeanor, McGee's comparative analysis claim fails.

29

*6. Juror 4191*

*a. Trial court proceedings*

Juror 4191 was a retired teacher with prior jury service. During voir dire, the juror informed the court that he had an "unfair" experience with the police about which he had written a letter of complaint. The juror explained that although he did not have problems with all "police officers," he believed that there "are some who stretch the truth to make their case." When asked whether he would have "a problem" following the court's instructions, the juror stated "maybe," explaining that "I know the law is not always correct" and that "laws are made for man."

In response to further questioning, juror number 4191 stated that he believed he had been "arrested for being Black in public." He also indicated that his negative feelings about police officers would be triggered if an offense involved "alcohol, drugs, anything like that would involve any incidents where you get detained and stopped and put in jail for having a dirty license plate, for having a broken tail light, something else." Juror number 4191 clarified, however, that he had a positive impression of most police officers, he had a brother-in-law and friends who worked in law enforcement and that he believed he could follow the court's instructions.

The prosecutor explained that he had challenged juror 4191 based on his "feelings about police officers" and his "inconsistent statements about his beliefs on the law and whether or not he was even going to follow the law." According to the prosecution, the juror "seemed to have his own agenda, to have some very strong opinions coming into this process."

The court found the prosecutor's reasons credible, explaining: "Juror number 4191 . . . says he has a problem with cops. Some stretch the truth to make their case. . . . That he had been arrested for being black in public. Certainly I think this juror has some strong—I think the people can infer that this juror has some strong biases based on his answers to voir dire."

30

### b. McGee's comparative juror analysis of juror 4191 does not demonstrate discriminatory intent

McGee contends that the prosecutor's reasons for striking juror 4191 were not credible because the prosecutor had failed to challenge juror 9694, who had likewise expressed "strong opinions . . . related to the criminal justice system. . . . [¶] Since Juror 9694 came with strong opinions, one would have expected the prosecutor to have challenged her given his explanations for striking Juror[] . . . 4191"

A comparative analysis, however, demonstrates there is no similarity between the "strong opinions" expressed by jurors 4191 and 9694. At the *Wheeler* hearing, the prosecutor explained that juror 9694 had provided "strong opinions" regarding her experiences as a witness during a criminal trial. The juror explained at voir dire that she had previously testified for the prosecution in a case involving a home invasion. Juror 9694 described her treatment at the trial as "unfair," explaining that the attorneys had made her "seem like she was the criminal." At the *Wheeler* hearing, the prosecutor informed the court he believed these "strong" comments suggested juror 9694 would react negatively if defense counsel attempted to use aggressive tactics against any testifying witnesses. The prosecutor further noted that juror 9694 had been seated "very late in the process" and that he decided to keep her on the jury because he was "not sure what else [he] was going to get."

We see no relation between juror 9694's "strong attitudes" about her personal experiences as a trial witness, and juror 4191's "strong" statements regarding police officers and his willingness to follow the law. (*DeHoyos, supra*, 57 Cal.4th at p. 107.)

### 7. Juror 4303

#### a. Trial court proceedings

Juror 4303 performed clerical duties for the Hubert Humphrey Medical Center. During voir dire, he informed the court he had been the victim of robbery, burglary, theft and a "hit and run." The juror stated that he had only reported some of these crimes, noting there was "no particular reason" why he reported some crimes, but not others.

Juror number 4303 also stated that he had "four relatives who have been shot, stabbed, robbed, grand theft auto [*sic*]." Two years earlier, the juror was arrested and "went to jail" on a "traffic warrant" that had been issued because he "wasn't paying his tickets." At voir dire, the court asked juror 4303 to remove a toothpick from his mouth.

The prosecutor informed the court he had struck juror 4303 because he had "been jailed for unpaid traffic tickets. He also indicated that he had been a victim of several crimes but did not report all of them. He also indicated that he had several relatives who had been victims of violent crimes. Finally, the court admonished him for talking with a toothpick in his mouth. The prosecutor believed that [this juror] did not have respect for the criminal justice system as evidenced by his reluctance to pay traffic fines, his failure to report crime, and his disrespectful attitude displayed in front of this court."

The trial court found these reasons credible, noting that the juror "had the toothpick in his mouth and [was] ask[ed] to remove it. It does appear that he has some disrespect for the juridical system, the [prior arrest] and, again, the toothpick in his mouth. It appears to the court there was certainly adequate reason for the people to challenge him aside from any race considerations."

> b.  *McGee's comparative juror analysis of juror 4303 does not demonstrate discriminatory intent*

McGee argues that the prosecutor's stated reasons for dismissing juror 4303 were not credible because the prosecutor accepted two other jurors—numbers 3997 and 8755—who had previously been convicted of driving while under the influence of alcohol.

McGee has failed to demonstrate that jurors 3997 and 8755 were similarly situated to juror 4303. First, as explained above, jurors 3997 and 8755 convictions for driving while under the influence convictions were substantially older (9 years and 18 years respectively) than juror 4303's traffic warrant arrest, which occurred only two years prior to the voir dire. Moreover, the prosecutor explained that he did not strike juror 4303 based solely on his prior arrest; rather, the prosecutor explained that the arrest, combined

with the fact the juror had failed to report crimes and been asked to remove a tooth pick from his mouth at voir dire, suggested he did not respect the judicial system. (See generally *People v. Barber* (1988) 200 Cal.App.3d 378, 396 [peremptory permissible based on fact that juror was wearing a "Coors jacket" which may have suggested lack of respect for the court]; *People v. Jordan* (2006) 146 Cal.App.4th 232, 254-255 [affirming dismissal of prospective juror in part because she had been chewing gum during voir dire, showing a lack of respect for the court].) We find no basis for concluding that jurors 3997 or 8755 exhibited characteristics that were "materially similar" to those exhibited by juror 4303. (*DeHoyos, supra*, 57 Cal.4th at p. 107.)

### 8. Juror 9744

#### a. Trial court proceedings

Juror number 9744, called as a prospective alternative juror, was unmarried, had one adult daughter and worked as a customer service representative for a dental company. She had never witnessed or been the victim of a crime and had previously served on a jury that reached a verdict. During voir dire, juror 9744 informed the court she had "nephews and cousins that [were currently imprisoned]," explaining that "one was [in jail] for bank robbery, one [was in jail] for embezzlement" and that she did "know what the other one did." The prosecutor did not ask juror 9744 any questions.

The People informed the trial court juror 9744 had been challenged because she had a "large number of relatives in prison," including "'nephews and cousins" who had committed "bank robbery, . . . embezzlement, and another . . . unknown crime." The court found this reason credible, explaining: "Here again we have somebody who has family members involved in fairly serious crimes and would appear to me that would be a valid reason for the prosecutor to exercise a peremptory . . ."

#### b. McGee's comparative juror analysis of juror 9744 does not demonstrate discriminatory intent

McGee argues that a comparative juror analysis demonstrates the prosecution's proffered reason for striking juror 9744—family criminal history—was pretext for

33

discrimination. Although McGee does not dispute a prosecutor may challenge a juror based on "relative[s]' contact[s] with the criminal justice system" (*People v. Farnam* (2002) 28 Cal.4th 107, 138; see also *Avila, supra,* 38 Cal.4th at pp. 554-555), he argues that, in this case, the prosecution did not strike four other jurors (numbers 7458, 6624, 3977, 9694) who had family members that were involved in criminal activity.[8]

We reject McGee's argument for multiple reasons. First, McGee overlooks that juror 9744 was a prospective alternate for a jury panel that already included numerous individuals who had friends or family members that were involved in criminal activity. In *Lenix*, our Supreme Court emphasized that when conducting a comparative analysis, we must remain cognizant that "the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled. . . . '[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box." (*Lenix, supra*, 44 Cal.4th at p. 623.) As the Ninth Circuit explained in assessing this same argument during federal habeas proceedings, the trial court did not act improperly in "accept[ing] as race-neutral the desire not to add another juror whose relatives had criminal convictions to a jury that already had several such jurors." (*McGee IV, supra*, Fed.Appx. at p. 591; see also *Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 717 fn. 13 [California courts may "cite and rely on unpublished federal . . . court decisions as persuasive authority"].)

Second, McGee's argument overlooks relevant differences in the characteristics of juror 9744 and those of the four jurors who were left on the panel despite their family

---

[8]     McGee also argues that the prosecution's reason for striking juror 9744 were pretext because "[m]ost of the prospective jurors had close relatives who were crime victims or they had been victims themselves. Indeed, of the 14 jurors actually sworn to hear . . . McGee's case, only five did not fall into this category." We fail to see how this information is relevant to assessing the prosecutor's reasons for striking juror 9744. The prosecutor did not claim he struck juror 9744 because she was a victim of crime or because her family members had been victims of crime. Rather, the prosecutor stated that he struck the juror because she had close family members who were currently incarcerated for crimes they had committed.

criminal history. The record indicates that juror 7458 informed the court one of her brothers had been arrested for failing to pay parking tickets, while another brother was arrested in high school for shoplifting. The prosecutor could reasonably believe that such offenses were qualitatively different than the crimes juror 9744's family members had committed, which included bank robbery, embezzlement and a third undisclosed offense.

Similarly, juror 6624 stated that she believed her brother "may" have been arrested for driving while under the influence of alcohol and that her son had been arrested after a "pipe" was found in his car. She explained that her son had gone "on a trip with three other guys and they were coming home from a snow trip, and they were stopped for speeding and somehow it turned into them searching the car and they found what was classified as drug paraphernalia, a pipe, so they were arrested." Again, the prosecutor could reasonably believe such crimes were qualitatively different than bank robbery or embezzlement.

Juror 3977 informed the court that his brother was a "habitual offender" who was currently in prison for "a number of things." Unlike juror 9744, juror's 3977 statement demonstrated he had only one family member with a criminal background. Moreover, as the People argue in their return, juror 3977's "characterization of his brother as a 'habitual offender'" could have been reasonably interpreted by the prosecutor as an indication that the jury "disapproved of his brother's lifestyle."

Finally, as discussed above, although juror 9694 had multiple cousins serving time in prison for violent offenses, the prosecutor explained there were two reasons he had elected not to challenge her. First, the prosecutor noted that juror 9694 had provided answers during voir dire indicating she would react negatively if defense counsel questioned testifying witnesses in an aggressive manner. Second, the prosecutor explained that juror 9694 was selected "late in the process" and that, given the high concentration of prior prospective jurors who had "previously been convicted of of moral turpitude crimes," he elected to "keep 9694 at that point in time because [he] wasn't sure what else I was going to get." McGee has provided no explanation why these explanations regarding juror 9694 are not reasonable or credible.

In sum, we conclude that the comparative analysis McGee has provided in relation to each of these eight African-American jurors is insufficient to demonstrate the trial court erred in crediting the prosecutor's race neutral reasons for exercising his peremptory challenges.[9]

**DISPOSITION**

The petition for writ of habeas corpus is denied.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

---

[9]    Although McGee's petition also argues that a comparative analysis demonstrates juror 5912 was also struck based on his race, McGee concedes in his petition that his counsel "withdrew his challenge to the striking of juror 5912" during the *Wheeler* hearing.   The transcript of the hearing indicates that after defense counsel was reminded juror number 5912 had a recent conviction for petty theft, counsel stated "I have no problem with that peremptory challenge."  To the extent counsel's statement does not constitute a waiver of any *Wheeler* claim regarding juror 5912, McGee's comparative analysis does not demonstrate the court erred in crediting the prosecutor's reasons for striking this juror.  The prosecutor explained that juror 5912 had no prior jury experience, a cousin serving a life sentence in prison and a two year old conviction for petty theft. McGee has failed to identify any accepted juror who shared these combination of qualities—lack of jury service, a recent criminal conviction and a family member serving an extended life sentence.

36